# SUPREME COURT,

## STATE OF KANSAS.

## JANUARY TERM, 1877.

### PRESENT:

Hon. ALBERT H. HORTON, Chief Justice.
Hon. DANIEL M. VALENTINE, ⎱ Associate Justices.
Hon. DAVID J. BREWER, ⎰

---

B. W. LEMERT v. M. BARNES, as *Executor*, &c.

1. Occupying-Claimant Act; *Practice.* The practice under the occupying-claimant act discussed.

2. ———— *Purchase-Money Paid by Occupying Claimant; Act of 1874, con-strued.* The land in controversy in this case was originally a part of the Osage Indian reserve, but was afterward, under the provisions of article 14 of the Osage Indian treaty of September 29th 1855, allotted to a certain half-breed Osage Indian. On August 3d 1867, the occupying claimant procured his title to said land from said half-breed Indian, and paid him therefor $350. Said occupying claimant then took possession of said land, and has been in possession ever since. On February 3d 1872, the successful party in this case procured his title to said land from said half-breed Indian. On February 7th 1872, this action was commenced. On March 26th 1874, an act of the legislature, which was passed March 7th 1874, took effect, which act provides among other things as follows: "That when in any case any of said [ Indian ] lands are held by any person who has purchased the same in good faith, and for a valuable consideration, from the Indian or Indians to whom the same were allotted under such treaty, * * * such purchaser shall not in any case be evicted from such lands by any other person or persons who may have subsequently acquired an adverse title to the same, until such purchaser shall have been repaid the full amount of his or her purchase-money, with lawful interest thereon." Afterward judgment was rendered in this case in favor of the second and subsequent purchaser for the land, but the first purchaser was allowed to recover said purchase-money, with interest, amounting to $460.25. *Held,* That the court below erred in allowing said purchase-money; that said act

2—18 KAS.

cannot have the effect to require the second purchaser under the circumstances of this case to pay said purchase-money.

### *Error from Neosho District Court.*

ACTION to quiet title to certain lands, brought by Giltenan, the testator of *Barnes*, defendant in error. The case was here in July 1874; (13 Kas. 476.) On being remanded to the district court, it was again tried, at the December Term 1874, the trial resulting in a finding and judgment in favor of *Lemert*, defendant. Certain proceedings were thereupon taken by Giltenan, as an "occupying claimant," for the allowance of the purchase-money paid and the improvements made by him, which proceedings were concluded at the April Term 1875. They are sufficiently stated in the opinion, *infra*. In such proceedings the district court allowed to Giltenan $460 for his improvements, and $460.25 for the purchase-money paid by him, and interest on same; and from such allowances *Lemert* appealed, and brought the record here for review. Since the petition in error was filed, Giltenan has deceased, and his executor, *M. Barnes*, has been substituted as defendant in error.

*Stillwell & Baylies*, for plaintiff in error.

*Hutchings & Denison*, for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This action was originally commenced by Daniel Giltenan against B. W. Lemert, to quiet title to a certain piece of land. Lemert answered, setting up title in himself, and asking for a judgment in his favor for the recovery of said land, and for the possession thereof. The case was afterward tried; judgment was rendered in favor of the defendant; the plaintiff then brought the case to this court, where the judgment of the court below was reversed, and cause remanded for a new trial. (*Giltenan v. Lemert*, 13 Kas. 476.) A new trial was afterward had, and again judgment was rendered in favor of the defendant for the land; but

at this time the plaintiff made an application for the benefit of the occupying-claimant law, (Gen. Stat. 749, et seq.,) and of section 2 of the act to protect *bona fide* purchasers of Indian lands. (Laws of 1874, p. 139.) The court below granted the application. And of this the defendant below, who is now plaintiff in error, complains, and seeks ·by this petition to have the same reversed. Whether said application was rightfully or wrongfully granted, is the only question in the case which we need consider. The facts of the case are substantially as follows: The land in controversy was originally a part of the Osage Indian reserve, and a part of that portion of said reserve which was afterward called the Osage ceded lands. By article 14 of the treaty with the Osage Indians, of September 26th 1865, (14 U. S. Stat. at Large, 689,) it is provided as follows:

"The half-breeds of the Osage tribe of Indians, not to exceed twenty-five in number, who have improvements on the north half of the lands sold to the United States, shall have a patent issued to them, in fee simple, for eighty acres each, to include, as far as practicable, their improvements, said half-breeds to be designated by the chiefs and headmen of the tribe; * * * all of said lands to be selected by the parties, subject to the approval of the Secretary of the Interior."

The land in controversy was a part of "the north half of the lands sold to the United States" under the provisions of this treaty. At the time that this treaty was made, Gesso Chouteau, who was a half-breed Osage Indian, occupied, with his wife and family, the land now in controversy, and had improvements thereon. It was his homestead. Chouteau claimed to be one of the twenty-five half-breed Osage Indians who should receive land under the provisions of said article 14 of said treaty; and immediately after the promulgation of said treaty, he selected the land in controversy as the land which he should so receive. On August 3d 1867, while Chouteau and his family were still occupying said land as their homestead, he sold said land to Giltenan for $350, and he alone executed to Giltenan a quitclaim deed for said land. At the same time there was a parol contract made between

the parties, in substance, but not in these exact words, that Giltenan should get the title to said land from the government in his own name if he could, but if he could not, and if such title should be transferred from the government to Chouteau, then Chouteau was to execute another deed to Giltenan for the land. About August 11th 1867, Giltenan took possession of said land, and has occupied the same as the homestead of himself and family ever since, and has made lasting and valuable improvements thereon. After said quitclaim deed was executed to Giltenan, and on September 16th 1867, Chouteau was designated by the chiefs and headmen of said tribe of Indians as one of the half-breed Osage Indians who should receive lands under said Osage treaty. Afterward, and on June 15th 1869, Chouteau's selection of said land was approved by the Secretary of the Interior, and on June 10th 1870 a patent for said land was issued to Chouteau. On February 3d 1873, Chouteau and wife executed to Lemert a general warranty deed for said land. All these facts were shown to the court, and jury, on said second trial; and the jury then found thereon a verdict in favor of the defendant, Lemert.

The plaintiff, Giltenan, then made an application for relief under the provisions of the occupying-claimant act, and under the act to protect *bona fide* purchasers of Indian lands, as aforesaid. This application was in writing, but just what it contained, and how much it contained, we have not

1. Occupying-claimant act. Proceedings and practice.

been informed, and cannot tell, for the plaintiff in error has not seen fit to bring such application to this court. We must therefore, in support of the decision of the court below, presume that it was sufficient, and that it contained all that was necessary for it to contain. The court below then rendered judgment in favor of the defendant for the land, but also at the same time granted plaintiff's application for the relief asked for under said acts. The granting of said application was done upon no other evidence than that introduced on the trial, and that contained in the application itself. The plaintiff in error claims that said applica-

tion was made after said judgment was rendered, and not before. The record however would seem to show that it was made both before and after. But as all these acts were done substantially at the same time, we suppose it makes but very little difference which was done first. The plaintiff in error seems also to claim that the application should have been embodied in the pleadings. This cannot be so. The law certainly does not contemplate that any party litigating the question of ownership to land, shall set forth in his pleadings that he expects to claim the benefit of the occupying-claimant act, and thereby confess the hopelessness of his cause. It is only when a party is defeated, when his antagonist has set up and proved an adverse and better title, that he should make his application; and even then no formal or written application is required. Section 603 of the code (Gen. Stat. 750) provides how the occupying claimant shall make his application. It says:

"The court rendering judgment in any case provided for by this act, against the occupying claimant, shall, at the request of either party, cause a journal entry thereof to be made; and the sheriff and clerk of the court, when thereafter required by either party, shall meet and draw from the box a jury of twelve men," etc.

And this jury, upon an actual view of the premises, and upon proper evidence, determines the whole question as to how much the occupying claimant shall receive for the lasting and valuable improvements made by him. As to what evidence is required before granting an application in an occupying-claimant's case, it is not necessary to determine in this case. Sufficient evidence for such a purpose was introduced on the trial of this case, and presumptively sufficient evidence was embodied in the plaintiff's said application. But whether the evidence introduced on the trial should be taken into consideration by the court granting the application, is questioned in this case; and while we do not think it is necessary to decide that question in this case, still we would think such evidence might be taken into consideration. Probably all that is necessary in such a case is, that the court shall

be able to know from the evidence introduced on the trial, or from evidence submitted at the time of the hearing of the application, that the applicant's title to the land, though defective, is one provided for by the occupying-claimant act. And we suppose that, since the decision in the case of *Krause v. Means*, 12 Kas. 335, there can be no question that this case comes within the occupying-claimant act. In that case it was held that, although the Indian owner, (who was a woman,) had no power to sell her land, yet, that she could, at the same time, so permit it to be incumbered by an occupying claimant's right or lien that afterward, when she obtained the power to sell the land, she could not sell it so as to defeat an occupying claimant's right, and that such occupying claimant could set up his right against any subsequent grantee of hers.

Said act to protect the *bona fide* purchasers of Indian lands, provides among other things as follows:

"That when in any case any of said lands are held by any person who has purchased the same in good faith, and for a valuable consideration, from the Indian or Indians to whom the same were allotted under such treaty, * * * such purchaser shall not in any case be evicted from such lands by any other person or persons who may have subsequently acquired an adverse title to the same, until such purchaser shall have been repaid the full amount of his or her purchase-money, with lawful interest thereon."

The jury in this case assessed the value of the improvements made by Giltenan, over and above all waste and 2. Purchase-mo- profits, at $460, and fixed the amount of the ney. Act of March 7, 1874. purchase-money paid by Giltenan to Chouteau, with interest, at $460.25; total, $920.25. And the court below allowed this amount to Giltenan. Now, it will be remembered that Giltenan procured his title from Chouteau, and paid said $350 purchase-money to Chouteau on August 3d 1867; and that Lemert procured his title from Chouteau and wife on February 3d 1872. This action was commenced February 7th 1872. And the said act to protect *bona fide* purchasers of Indian lands was not passed until March 7th 1874. And up to March 26th 1874, (the time

when said act took effect,) there was no law authorizing any person 'evicted from Indian lands, or from any other lands, to recover from the successful party the amount of the purchase-money which such unsuccessful party had paid. It will be seen that this action was pending for more than two years before said act took effect; and if judgment had been rendered at any time during that two years, nothing could have been allowed Giltenan for said purchase-money. When Lemert purchased said land, it was free and clear from all liens, charges, or incumbrances for purchase-money. It remained so up to the commencement of this suit, and for more than two years thereafter. And nothing has transpired since to create any such lien, charge, or incumbrance, except the mere passage of said act of the legislature. And what power has the legislature to impose such a lien, charge, or incumbrance upon the land of Lemert, without his consent, even if the legislature so desired? It is our opinion that said act cannot have the effect, under the circumstances of this case, to require Lemert to pay to Giltenan said purchase-money.

The judgment of the court below will therefore be so modified as to require Lemert to pay only the $460 for said improvements; and he will not be required to pay said $460.25, purchase-money and interest. The costs of this court will be equally divided between the parties.

BREWER, J., concurring.

HORTON, C. J., not sitting in the case.