PIERSON ET AL. *v.* RAY ET AL.

No. 79.  Argued January 11, 1967.—Decided April 11, 1967.*

*Together with No. 94, *Ray et al.* v. *Pierson et al.,* also on certiorari to the same court.

*Carl Rachlin* argued the cause for petitioners in No. 79 and for respondents in No. 94. With him on the briefs was *Melvin L. Wulf.*

*Elizabeth Watkins Hulen Grayson* argued the cause for respondents in No. 79 and for petitioners in No. 94. With her on the brief was *Thomas H. Watkins.*

MR. CHIEF JUSTICE WARREN delivered the opinion of Court.

These cases present issues involving the liability of local police officers and judges under § 1 of the Civil Rights Act of 1871, 17 Stat. 13, now 42 U. S. C. § 1983.[1] Peti-

---

[1] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to·be subjected, any citizen of the United States 'or other person within·the jurisdiction thereof to the deprivation of·any

tioners in No. 79 were members of a group of 15 white and Negro Episcopal clergymen who attempted to use segregated facilities at an interstate bus terminal in Jackson, Mississippi, in 1961. They were arrested by respondents Ray, Griffith, and Nichols, policemen of the City of Jackson, and charged with violating § 2087.5 of the Mississippi Code, which makes guilty of a misdemeanor anyone who congregates with others in a public place under circumstances such that a breach of the peace may be occasioned thereby, and refuses to move on when ordered to do so by a police officer.[2] Petitioners[3] waived a jury trial and were convicted of the offense by respondent Spencer, a municipal police justice. They were each given the maximum sentence of four months in jail and

---

rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U. S. C. § 1983.

[2] "1. Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby:

"(1) crowds or congregates with others in . . . any hotel, motel, store, restaurant, lunch counter, cafeteria, sandwich shop, . . . or any other place of business engaged in selling or serving members of the public, or in or around any free entrance to any such place of business or public building, or to any building owned by another individual, or a corporation, or a partnership or an association, and who fails or refuses to disperse and move on, or disperse or move on, when ordered so to do by any law enforcement officer of any municipality, or county, in which such act or acts are committed, or by any law enforcement officer of the State of Mississippi, or any other authorized person, . . . shall be guilty of disorderly conduct, which is made a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not more than two hundred dollars ($200.00), or imprisonment in the county jail for not more than four (4) months, or by both such fine and imprisonment . . . ."

[3] The ministers involved in No. 79 will be designated as "petitioners" throughout this opinion, although they are the respondents in No. 94.

a fine of $200. On appeal petitioner Jones was accorded a trial *de novo* in the County Court, and after the city produced its evidence the court granted his motion for a directed verdict. The cases against the other petitioners were then dropped.

Having been vindicated in the County Court, petitioners brought this action for damages in the United States District Court for the Southern District of Mississippi, Jackson Division, alleging that respondents had violated § 1983, *supra,* and that respondents were liable at common law for false arrest and imprisonment. A jury returned verdicts for respondents on both counts. On appeal, the Court of Appeals for the Fifth Circuit held that respondent Spencer was immune from liability under both § 1983 and the common law of Mississippi for acts committed within his judicial jurisdiction. 352 F. 2d 213. As to the police officers, the court noted that § 2087.5 of the Mississippi Code was held unconstitutional as applied to similar facts in *Thomas* v. *Mississippi,* 380 U. S. 524 (1965).[4] Although *Thomas* was decided years after the arrest involved in this trial, the court held that the policemen would be liable in a suit under § 1983 for an unconstitutional arrest even if they acted in good faith and with probable cause in making an arrest under a state statute not yet held invalid. The court believed that this stern result was required by *Monroe* v. *Pape,*

---

[4] In *Thomas* various "Freedom Riders" were arrested and convicted under circumstances substantially similar to the facts of these cases. The police testified that they ordered the "Freedom Riders" to leave because they feared that onlookers might breach the peace. We reversed without argument or opinion, citing *Boynton* v. *Virginia,* 364 U. S. 454 (1960). *Boynton* held that racial discrimination in a bus terminal restaurant utilized as an integral part of the transportation of interstate passengers violates § 216 (d) of the Interstate Commerce Act. State enforcement of such discrimination is barred by the Supremacy Clause.

365 U. S. 167 (1961). Under the count based on the common law of Mississippi, however, it held that the policemen would not be liable if they had probable cause to believe that the statute had been violated, because Mississippi law does not require police officers to predict at their peril which state laws are constitutional and which are not. Apparently dismissing the common-law claim,[5] the Court of Appeals reversed and remanded for a new trial on the § 1983 claim against the police officers because defense counsel had been allowed to cross-examine the ministers on various irrelevant and prejudicial matters, particularly including an alleged convergence of their views on racial justice with those of the Communist Party. At the new trial, however, the court held that the ministers could not recover if it were proved that they went to Mississippi anticipating that they would be illegally arrested because such action would constitute consent to the arrest under the principle of *volenti non fit injuria,* he who consents to a wrong cannot be injured.

We granted certiorari in No. 79 to consider whether a local judge is liable for damages under § 1983 for an unconstitutional conviction and whether the ministers should be denied recovery against the police officers if they acted with the anticipation that they would be illegally arrested. We also granted the police officers' petition in No. 94 to determine if the Court of Appeals correctly held that they could not assert the defense of

---

[5] Respondents read the court's opinion as remanding for a new trial on this claim. The court stated, however, that the officers "are immune from liability for false imprisonment at common law but not from liability for violations of the Federal statutes on civil rights. It therefore follows that there should be a new trial of the civil rights claim against the appellee police officers so that there may be a determination of the fact issue as to whether the appellants invited or consented to the arrest and imprisonment." 352 F. 2d, at 221.

good faith and probable cause to an action under § 1983 for unconstitutional arrest.[6]

The evidence at the federal trial showed that petitioners and other Negro and white Episcopal clergymen undertook a "prayer pilgrimage" in 1961 from New Orleans to Detroit. The purpose of the pilgrimage was to visit church institutions and other places in the North and South to promote racial equality and integration, and, finally, to report to a church convention in Detroit. Letters from the leader of the group to its members indicate that the clergymen intended from the beginning to go to Jackson and attempt to use segregated facilities at the bus terminal there, and that they fully expected to be arrested for doing so. The group made plans based on the assumption that they would be arrested if they attempted peacefully to exercise their right as interstate travelers to use the waiting rooms and other facilities at the bus terminal, and the letters discussed arrangements for bail and other matters relevant to arrests.

The ministers stayed one night in Jackson, and went to the bus terminal the next morning to depart for Chattanooga, Tennessee. They entered the waiting room, disobeying a sign at the entrance that announced "White Waiting Room Only—By Order of the Police Department." They then turned to enter the small terminal restaurant but were stopped by two Jackson police officers, respondents Griffith and Nichols, who had been awaiting their arrival and who ordered them to "move on." The ministers replied that they wanted to eat,

---

[6] Respondents did not challenge in their petition in No. 94 the holding of the Court of Appeals that a new trial is necessary because of the prejudicial cross-examination. Belatedly, they devoted a section of their brief to the contention that the cross-examination was proper. This argument is no more meritorious than it is timely. The views of the Communist Party on racial equality were not an issue in these cases.

and refused to move on. Respondent Ray, then a police captain and now the deputy chief of police, arrived a few minutes later. The ministers were placed under arrest and taken to the jail.

All witnesses including the police officers agreed that the ministers entered the waiting room peacefully and engaged in no boisterous or objectionable conduct while in the "White Only" area. There was conflicting testimony on the number of bystanders present and their behavior. Petitioners testified that there was no crowd at the station, that no one followed them into the waiting room, and that no one uttered threatening words or made threatening gestures. The police testified that some 25 to 30 persons followed the ministers into the terminal, that persons in the crowd were in a very dissatisfied and ugly mood, and that they were mumbling and making unspecified threatening gestures. The police did not describe any specific threatening incidents, and testified that they took no action against any persons in the crowd who were threatening violence because they "had determined that the ministers was the cause of the violence if any might occur,"[7] although the ministers were concededly orderly and polite and the police did not claim that it was beyond their power to control the allegedly disorderly crowd. The arrests and convictions were followed by this lawsuit.

We find no difficulty in agreeing with the Court of Appeals that Judge Spencer is immune from liability for damages for his role in these convictions. The record is barren of any proof or specific allegation that Judge Spencer played any role in these arrests and convictions other than to adjudge petitioners guilty when their cases came before his court.[8] Few doctrines were more solidly

[7] Transcript of Record, at 347. (Testimony of Officer Griffith.)

[8] Petitioners attempted to suggest a "conspiracy" between Judge Spencer and the police officers by questioning him about his reasons

established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine, in *Bradley* v. *Fisher,* 13 Wall. 335 (1872). This immunity applies even when the judge is accused of acting maliciously and corruptly, and it "is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." (*Scott* v. *Stansfield,* L. R. 3 Ex. 220, 223 (1868), quoted in *Bradley* v. *Fisher, supra,* 349, note, at 350.) It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation.

We do not believe that this settled principle of law was abolished by § 1983, which makes liable "every person" who under color of law deprives another person of his civil rights. The legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities. Accordingly, this Court held in *Tenney* v. *Brandhove,* 341 U. S. 367 (1951), that the immunity of legislators for acts within the legislative role was not abolished. The immunity of judges for acts within the judicial role is equally well established, and

---

for finding petitioners guilty in these cases and by showing that he had found other "Freedom Riders" guilty under similar circumstances in previous cases. The proof of conspiracy never went beyond this suggestion that inferences could be drawn from Judge Spencer's judicial decisions. See Transcript of Record, at 352–371.

we presume that Congress would have specifically so provided had it wished to abolish the doctrine.[9]

The common law has never granted police officers an absolute and unqualified immunity, and the officers in this case do not claim that they are entitled to one. Their claim is rather that they should not be liable if they acted in good faith and with probable cause in making an arrest under a statute that they believed to be valid. Under the prevailing view in this country a peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved. Restatement, Second, Torts § 121 (1965); 1 Harper & James, The Law of Torts § 3.18, at 277–278 (1956); *Ward* v. *Fidelity & Deposit Co. of Maryland,* 179 F. 2d 327 (C. A. 8th Cir. 1950). A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does. Although the matter is not entirely free from doubt,[10] the same consideration would seem to require excusing him from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional, on its face or as applied.

The Court of Appeals held that the officers had such a limited privilege under the common law of Mississippi,[11] and indicated that it would have recognized a similar privilege under § 1983 except that it felt compelled to hold otherwise by our decision in *Monroe* v. *Pape,* 365 U. S.

---

[9] Since our decision in *Tenney* v. *Brandhove, supra,* the courts of appeals have consistently held that judicial immunity is a defense to an action under § 1983. See *Bauers* v. *Heisel,* 361 F. 2d 581 (C. A. 3d Cir. 1966), and cases cited therein.

[10] See Caveat, Restatement, Second, Torts § 121, at 207–208 (1965); *Miller* v. *Stinnett,* 257 F. 2d 910 (C. A. 10th Cir. 1958).

[11] See *Golden* v. *Thompson,* 194 Miss. 241, 11 So. 2d 906 (1943).

167 (1961). *Monroe* v. *Pape* presented no question of immunity, however, and none was decided. The complaint in that case alleged that "13 Chicago police officers broke into petitioners' home in the early morning, routed them from bed, made them stand naked in the living room, and ransacked every room, emptying drawers and ripping mattress covers. It further allege[d] that Mr. Monroe was then taken to the police station and detained on 'open' charges for 10 hours, while he was interrogated about a two-day-old murder, that he was not taken before a magistrate, though one was accessible, that he was not permitted to call his family or attorney, that he was subsequently released without criminal charges being preferred against him." 365 U. S., at 169. The police officers did not choose to go to trial and defend the case on the hope that they could convince a jury that they believed in good faith that it was their duty to assault Monroe and his family in this manner. Instead, they sought dismissal of the complaint, contending principally that their activities were so plainly illegal under state law that they did not act "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory" as required by § 1983. In rejecting this argument we in no way intimated that the defense of good faith and probable cause was foreclosed by the statute. We also held that the complaint should not be dismissed for failure to state that the officers had "a specific intent to deprive a person of a federal right," but this holding, which related to requirements of pleading, carried no implications as to which defenses would be available to the police officers. As we went on to say in the same paragraph, § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." 365 U. S., at 187. Part of the background of tort liability, in the

case of police officers making an arrest, is the defense of good faith and probable cause.

We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983. This holding does not, however, mean that the count based thereon should be dismissed. The Court of Appeals ordered dismissal of the common-law count on the theory that the police officers were not required to predict our decision in *Thomas* v. *Mississippi,* 380 U. S. 524. We agree that a police officer is not charged with predicting the future course of constitutional law. But the petitioners in this case did not simply argue that they were arrested under a statute later held unconstitutional. They claimed and attempted to prove that the police officers arrested them solely for attempting to use the "White Only" waiting room, that no crowd was present, and that no one threatened violence or seemed about to cause a disturbance. The officers did not defend on the theory that they believed in good faith that it was constitutional to arrest the ministers solely for using the waiting room. Rather, they claimed and attempted to prove that they did not arrest the ministers for the purpose of preserving the custom of segregation in Mississippi, but solely for the purpose of preventing violence. They testified, in contradiction to the ministers, that a crowd gathered and that imminent violence was likely. If the jury believed the testimony of the officers and disbelieved that of the ministers, and if the jury found that the officers reasonably believed in good faith that the arrest was constitutional, then a verdict for the officers would follow even though the arrest was in fact unconstitutional. The jury did resolve the factual issues in favor of the officers but, for reasons previously stated,

its verdict was influenced by irrelevant and prejudicial evidence. Accordingly, the case must be remanded to the trial court for a new trial.

It is necessary to decide what importance should be given at the new trial to the substantially undisputed fact that the petitioners went to Jackson expecting to be illegally arrested. We do not agree with the Court of Appeals that they somehow consented to the arrest because of their anticipation that they would be illegally arrested, even assuming that they went to the Jackson bus terminal for the sole purpose of testing their rights to unsegregated public accommodations. The case contains no proof or allegation that they in any way tricked or goaded the officers into arresting them. The petitioners had the right to use the waiting room of the Jackson bus terminal, and their deliberate exercise of that right in a peaceful, orderly, and inoffensive manner does not disqualify them from seeking damages under § 1983.[12]

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Douglas, dissenting.

I do not think that all judges, under all circumstances, no matter how outrageous their conduct are immune

---

[12] The petition for certiorari in No. 79 also presented the question whether the Court of Appeals correctly dismissed the count based on the common law of Mississippi. We do not ordinarily review the holding of a court of appeals on a matter of state law, and we find no reason for departing from that tradition in this case. The state common-law claim in this case is merely cumulative, and petitioners' right to recover for an invasion of their civil rights, subject to the defense of good faith and probable cause, is adequately secured by § 1983.

from suit under 17 Stat. 13, 42 U. S. C. § 1983. The Court's ruling is not justified by the admitted need for a vigorous and independent judiciary, is not commanded by the common-law doctrine of judicial immunity, and does not follow inexorably from our prior decisions.

The statute, which came on the books as § 1 of the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13, provides that "every person" who under color of state law or custom "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." To most, "every person" would mean *every person,* not every person *except* judges. Despite the plain import of those words, the Court decided in *Tenney* v. *Brandhove,* 341 U. S. 367, that state legislators are immune from suit as long as the deprivation of civil rights which they caused a person occurred while the legislators "were acting in a field where legislators traditionally have power to act." *Id.,* at 379. I dissented from the creation of that judicial exception as I do from the creation of the present one.

The congressional purpose seems to me to be clear. A condition of lawlessness existed in certain of the States, under which people were being denied their civil rights. Congress intended to provide a remedy for the wrongs being perpetrated. And its members were not unaware that certain members of the judiciary were implicated in the state of affairs which the statute was intended to rectify. It was often noted that "[i]mmunity is given to crime, and the records of the public tribunals are searched in vain for any evidence of effective redress." Cong. Globe, 42d Cong., 1st Sess., 374. Mr. Rainey of South Carolina noted that "[T]he courts are in many instances under the control of those who are wholly inimical to the impartial administration of law and equity." *Id.,* at 394.

Congressman Beatty of Ohio claimed that it was the duty of Congress to listen to the appeals of those who "by reason of popular sentiment or secret organizations or prejudiced juries or bribed judges, [cannot] obtain the rights and privileges due an American citizen . . . ." *Id.,* at 429. The members supporting the proposed measure were apprehensive that there had been a complete breakdown in the administration of justice in certain States and that laws nondiscriminatory on their face were being applied in a discriminatory manner, that the newly won civil rights of the Negro were being ignored, and that the Constitution was being defied. It was against this background that the section was passed, and it is against this background that it should be interpreted.

It is said that, at the time of the statute's enactment, the doctrine of judicial immunity was well settled and that Congress cannot be presumed to have intended to abrogate the doctrine since it did not clearly evince such a purpose. This view is beset by many difficulties. It assumes that Congress could and should specify in advance all the possible circumstances to which a remedial statute might apply and state which cases are within the scope of a statute.

"Underlying [this] view is an atomistic conception of intention, coupled with what may be called a pointer theory of meaning. This view conceives the mind to be directed toward individual things, rather than toward general ideas, toward distinct situations of fact rather than toward some significance in human affairs that these situations may share. If this view were taken seriously, then we would have to regard the intention of the draftsman of a statute directed against 'dangerous weapons' as being directed toward an endless series of individual objects: re-

volvers, automatic pistols, daggers, Bowie knives, etc. If a court applies the statute to a weapon its draftsman had not thought of, then it would be 'legislating,' not 'interpreting,' as even more obviously it would be if it were to apply the statute to a weapon not yet invented when the statute was passed." Fuller, The Morality of Law 84 (1964).

Congress of course acts in the context of existing common-law rules, and in construing a statute a court considers the "common law before the making of the Act." *Heydon's Case,* 3 Co. Rep. 7 a, 76 Eng. Rep. 637 (Ex. 1584). But Congress enacts a statute to remedy the inadequacies of the pre-existing law, including the common law.[1] It cannot be presumed that the common law is the perfection of reason, is superior to statutory law (Sedgwick, Construction of Statutes 270 (1st ed. 1857); Pound, Common Law and Legislation, 21 Harv. L. Rev. 383, 404–406 (1908)), and that the legislature always changes law for the worse. Nor should the canon of construction "statutes in derogation of the common law are to be strictly construed" be applied so as to weaken a remedial statute whose purpose is to remedy the defects of the pre-existing law.

The position that Congress did not intend to change the common-law rule of judicial immunity ignores the fact that every member of Congress who spoke to the issue assumed that the words of the statute meant what they said and that judges would be liable. Many members of Congress objected to the statute because it im-

---

[1] "Remedial statutes are to be liberally construed." See generally, Llewellyn, Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed, 3 Vand. L. Rev. 395 (1950); Llewellyn, The Common Law Tradition, Appendix C (1960).

posed liability on members of the judiciary. Mr. Arthur of Kentucky opposed the measure because:

> "Hitherto . . . no judge or court has been held liable, civilly or criminally, for judicial acts . . . . Under the provisions of [section 1] every judge in the State court . . . will enter upon and pursue the call of official duty with the sword of Damocles suspended over him . . . ." Cong. Globe, 42d Cong., 1st Sess., 365–366.

And Senator Thurman noted that:

> "There have been two or three instances already under the civil rights bill of State judges being taken into the United States district court, sometimes upon indictment for the offense . . . of honestly and conscientiously deciding the law to be as they understood it to be. . . .
>
> "Is [section 1] intended to perpetuate that? Is it intended to enlarge it? Is it intended to extend it so that no longer a judge sitting on the bench to decide causes can decide them free from any fear except that of impeachment, which never lies in the absence of corrupt motive? Is that to be extended, so that every judge of a State may be liable to be dragged before some Federal judge to vindicate his opinion and to be mulcted in damages if that Federal judge shall think the opinion was erroneous? That is the language of this bill." Cong. Globe, 42d Cong., 1st Sess., Appendix 217.

Mr. Lewis of Kentucky expressed the fear that:

> "By the first section, in certain cases, the judge of a State court, though acting under oath of office, is made liable to a suit in the Federal court and subject to damages for his decision against a suitor. . . ." Cong. Globe, 42d Cong., 1st Sess., 385.

Yet despite the repeated fears of its opponents, and the explicit recognition that the section would subject judges to suit, the section remained as it was proposed: it applied to "any person." [2] There was no exception for members of the judiciary. In light of the sharply contested nature of the issue of judicial immunity it would be reasonable to assume that the judiciary would have been expressly exempted from the wide sweep of the section, if Congress had intended such a result.

The section's purpose was to provide redress for the deprivation of civil rights. It was recognized that certain members of the judiciary were instruments of oppression and were partially responsible for the wrongs to be remedied. The parade of cases coming to this Court shows that a similar condition now obtains in some of the States. Some state courts have been instruments of suppression of civil rights. The methods may have changed; the means may have become more subtle; but the wrong to be remedied still exists.

Today's decision is not dictated by our prior decisions. In *Ex parte Virginia,* 100 U. S. 339, the Court held that a judge who excluded Negroes from juries could be held liable under the Act of March 1, 1875 (18 Stat. 335), one of the Civil Rights Acts. The Court assumed that the judge was merely performing a ministerial function. But it went on to state that the judge would be liable under the statute even if his actions were judicial.[3] It is one thing to say that the common-law doctrine of

[2] As altered by the reviser who prepared the Revised Statutes of 1878, and as printed in 42 U. S. C. § 1983, the statute refers to "every person" rather than to "any person."

[3] The opinion in *Ex parte Virginia, supra,* did not mention *Bradley* v. *Fisher,* 13 Wall. 335, which held that a judge could not be held liable for causing the name of an attorney to be struck from the court rolls. But in *Bradley,* the action was not brought under any of the Civil Rights Acts.

judicial immunity is a defense to a common-law cause of action. But it is quite another to say that the common-law immunity rulé is a defense to liability which Congress has imposed upon "any officer or other person," as in *Ex parte Virginia,* or upon "every person" as in these cases.

The immunity which the Court today grants the judiciary is not necessary to preserve an independent judiciary. If the threat of civil action lies in the background of litigation, so the argument goes, judges will be reluctant to exercise the discretion and judgment inherent in their position and vital to the effective operation of the judiciary. We should, of course, not protect a member of the judiciary "who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good." *Gregoire* v. *Biddle,* 177 F. 2d 579, 581. To deny recovery to a person injured by the ruling of a judge acting for personal gain or out of personal motives would be "monstrous." *Ibid.* But, it is argued that absolute immunity is necessary to prevent the c'alling effects of a judicial inquiry, or the threat of such inquiry, into whether, in fact, a judge has been unfaithful to his oath of office. Thus, it is necessary to protect the guilty as well as the innocent.[4]

The doctrine of separation of powers is, of course, applicable only to the relations of coordinate branches of the same government, not to the relations between the

---

[4] Other justifications for the doctrine of absolute immunity have been advanced: (1) preventing threat of suit from influencing decision; (2) protecting judges from liability for honest mistakes; (3) relieving judges of the time and expense of defending suits; (4) removing an impediment to responsible men entering the judiciary; (5) necessity of finality; (6) appellate review is satisfactory remedy; (7) the judge's duty is to the public and not to the individual; (8) judicial self-protection; (9) separation of powers. See generally Jennings, Tort Liability of Administrative Officers, 21 Minn. L. Rev. 263, 271–272 (1937).

branches of the Federal Government and those of the States. See *Baker* v. *Carr,* 369 U. S. 186, 210. Any argument that Congress could not impose liability on state judges for the deprivation of civil rights would thus have to be based upon the claim that doing so would violate the theory of division of powers between the Federal and State Governments. This claim has been foreclosed by the cases recognizing "that Congress has the power to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State . . . ." *Monroe* v. *Pape,* 365 U. S. 167, 171–172. In terms of the power of Congress, I can see no difference between imposing liability on a state police officer (*Monroe* v. *Pape, supra*) and on a state judge. The question presented is not of constitutional dimension; it is solely a question of statutory interpretation.

The argument that the actions of public officials must not be subjected to judicial scrutiny because to do so would have an inhibiting effect on their work, is but a more sophisticated manner of saying "The King can do no wrong." [5] Chief Justice Cockburn long ago disposed of the argument that liability would deter judges:

> "I cannot believe that judges . . . would fail to discharge their duty faithfully and fearlessly according to their oaths and consciences . . . from any fear of exposing themselves to actions at law. I am persuaded that the number of such actions would be infinitely small and would be easily disposed of.

---

[5] Historically judicial immunity was a corollary to that theory. Since the King could do no wrong, the judges, his delegates for dispensing justice, "ought not to be drawn into question for any supposed corruption [for this tends] to the slander of the justice of the King." *Floyd & Barker,* 12 Co. Rep. 23, 25, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607). Because the judges were the personal delegates of the King they should be answerable to him alone. *Randall* v. *Brigham,* 7 Wall. 523, 539.

> While, on the other hand, I can easily conceive cases in which judicial opportunity might be so perverted and abused for the purpose of injustice as that, on sound principles, the authors of such wrong ought to be responsible to the parties wronged." *Dawkins* v. *Lord Paulet,* L. R. 5 Q. B. 94, 110 (C. J. Cockburn, dissenting).

This is not to say that a judge who makes an honest mistake should be subjected to civil liability. It is necessary to exempt judges from liability for the consequences of their honest mistakes. The judicial function involves an informed exercise of judgment. It is often necessary to choose between differing versions of fact, to reconcile opposing interests, and to decide closely contested issues. Decisions must often be made in the heat of trial. A vigorous and independent mind is needed to perform such delicate tasks. It would be unfair to require a judge to exercise his independent judgment and then to punish him for having exercised it in a manner which, in retrospect, was erroneous. Imposing liability for mistaken, though honest judicial acts, would curb the independent mind and spirit needed to perform judicial functions. Thus, a judge who sustains a conviction on what he forthrightly considers adequate evidence should not be subjected to liability when an appellate court decides that the evidence was not adequate. Nor should a judge who allows a conviction under what is later held an unconstitutional statute.

But that is far different from saying that a judge shall be immune from the consequences of any of his judicial actions, and that he shall not be liable for the knowing and intentional deprivation of a person's civil rights. What about the judge who conspires with local law enforcement officers to "railroad" a dissenter? What about the judge who knowingly turns a trial into a "kangaroo" court? Or one who intentionally flouts the

Constitution in order to obtain a conviction? Congress, I think, concluded that the evils of allowing intentional, knowing deprivations of civil rights to go unredressed far outweighed the speculative inhibiting effects which might attend an inquiry into a judicial deprivation of civil rights.[6]

The plight of the oppressed is indeed serious. Under *City of Greenwood* v. *Peacock,* 384 U. S. 808, the defendant cannot remove to a federal court to prevent a state court from depriving him of his civil rights. And under the rule announced today, the person cannot recover damages for the deprivation.

---

[6] A judge is liable for injury caused by a ministerial act; to have immunity the judge must be performing a judicial function. See, e. g., *Ex parte Virginia,* 100 U. S. 339; 2 Harper & James, The Law of Torts 1642–1643 (1956). The presence of malice and the intention to deprive a person of his civil rights is wholly incompatible with the judicial function. When a judge acts intentionally and knowingly to deprive a person of his constitutional rights he exercises no discretion or individual judgment; he acts no longer as a judge, but as a "minister" of his own prejudices.