332 S.E.2d 611

**Robert Ted PRITCHARD and Elizabeth A. Pritchard**

v.

**Brad CROUSER.**

**No. CC948.**

Supreme Court of Appeals of West Virginia.

Submitted April 30, 1985.

Decided July 3, 1985.

Robert Pritchard, pro se.

Robert M. Amos, Amos & Shay, Fairmont, for appellee.

NEELY, Chief Justice:

This case presents our first opportunity since *Pulliam v. Allen,* 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) to address the scope of judicial immunity under State law in West Virginia. Although the issue presented is of surpassing importance to the administration of justice, a lawsuit of the most humble origins prompts its arrival in this Court. On 6 July 1984 Mrs. Joe Pitrolo filed a petition in magistrate court to evict Robert and Elizabeth Pritchard, petitioners in this action, from a storeroom the Pritchards were renting from Mrs. Pitrolo and using as a residence. On 10 July 1984 the Sheriff personally served the petition, which alleged that the Pritchards owed $300 in rent.

On the day the complaint was served the Pritchards filed an answer that denied the allegations set forth in the complaint, moved for dismissal, and requested a special magistrate be appointed. "Affidavits of prejudice" against three of the four Marion County magistrates, including Magistrate Crouser, the respondent in this action, accompanied the Pritchards' answer. The magistrate court clerk assigned the case to Magistrate Crouser. Later that day Magistrate Crouser declined to disqualify himself pursuant to the Pritchards' "affidavit of prejudice" and advised the Pritchards that he would hear the case on 16 July 1984 as originally scheduled.

On 11 July 1984 the Pritchards applied to the Circuit Court of Marion County for a writ of prohibition, and for court costs, against Magistrate Crouser on the grounds that *W.Va.Code* 50–4–7 [1980][1] required

---

1. *W.Va.Code* 50–4–7 [1980] provides:

Any party to a civil or criminal proceeding before a magistrate in any county wherein there is more than one magistrate may file an affidavit that the magistrate before whom the matter is pending has a personal bias or prejudice either against him or in favor of any opposite party or that such magistrate has counseled with any opposite party with respect to the merits of the proceeding. The affidavit shall state the facts and reasons for belief in the truth thereof. Such affidavit must be filed at least two days before the trial or hearing date unless the grounds for such affidavit are not discovered until after such time. The supreme court of appeals shall provide a form affidavit which shall be made available to all parties and which shall comply with the requirements of this section.

Upon the timely filing of such affidavit, the magistrate shall transfer all matters relating to the case to the magistrate court clerk, who shall thereupon assign and transfer the matter to be heard by some other magistrate within the county upon an assignment basis to be established by the judge of the circuit court, or to

Magistrate Crouser to transfer the Pritchards' case. The circuit court awarded a rule to show cause and scheduled a hearing for 16 July 1984.

On 13 July 1984 Mrs. Pitrolo and Mr. Pritchard settled the case out of court. However, the Pritchards attended the 16 July hearing before the circuit court and moved to dismiss the prohibition proceeding, but prayed for an award of costs against Magistrate Crouser. The circuit court granted the motion. Magistrate Crouser moved to set aside the circuit court's order, but the circuit court denied that motion and held: (1) *W. Va. Code* 50–4–7 [1980] mandated that Magistrate Crouser transfer the Pritchards' case; and (2) Magistrate Crouser's "arbitrary" refusal to transfer the Pritchards' case made him liable for an award of costs.

From these proceedings spring two certified questions for this Court to answer (1) "Whether Chapter 50, Article 4, Section 7 of the *West Virginia Code* is mandatory or discretionary?" and, (2) "Whether the award of costs against a magistrate in a proceeding for a writ of prohibition for refusal to transfer an action is within the court's power?" The circuit court decided both questions in the affirmative.

## I

■ *W. Va. Code* 50–4–7 [1980] allows a litigant in a civil suit before a magistrate to transfer his case to a different magistrate

transfer all matters relating to the case to the magistrate court clerk, who shall thereupon assign and transfer the matter to be heard by some other magistrate within the county upon a rotation basis to be established by the judge of the circuit court, or the chief judge thereof if there is more than one judge of the circuit court. Such removal and assignment shall be permitted, however, only if there is some other magistrate in the county before whom the matter had not been previously pending. No party shall be entitled to cause such a removal more than once.

The magistrate to whom the matter is assigned shall set a new return date not more than five days from this receipt of the matter, shall notify all parties thereof, and shall proceed with the matter as if it has been originally assigned to him.

by filing a form affidavit stating that the magistrate before whom the matter is pending has a "personal bias or prejudice" either against the litigant or in favor of any opposing party. Upon the filing of the affidavit, the case is automatically transferred to the magistrate court clerk who must reassign the case to another magistrate. Although a litigant's right to transfer under *W. Va. Code* 50–4–7 [1980] is peremptory, with regard to one magistrate, it is not unlimited. The statute states: "No party shall be entitled to cause such removal more than once," and thus precludes the Pritchards' blunderbuss approach to magistrate disqualification.

Indeed, the powerful procedural right that *W. Va. Code* 50–4–7 [1980] confers requires some limitation. Accordingly, *W. Va. Code* 50–4–7 [1980] restricts a litigant to *one* peremptory challenge *without* a showing of actual prejudice. *W. Va. Code* 50–4–7 [1980] does not permit the disqualification of a county's entire magistrate bench, nor does it allow the disqualification, as in this case, of the entire bench save a favored magistrate. If the statute were to allow litigants peremptorily to remove an entire magistrate bench the challenge mechanism would cease to operate as a shield against judicial partiality and become a sword for forum shopping. Litigants could use *W. Va. Code* 50–4–7 [1980] to confer the partiality it was designed to prevent.[2] A faithful reading of the statute precludes this misapplication.

**2.** This Court's anxiety that litigants will use *W. Va. Code* 50–4–7 [1980], if left unnarrowed, for improper purposes is well founded. The time limitations imposed on *W. Va. Code* 50–4–7 [1980] evidence our concern. The statute requires that litigants file their "affidavits of prejudice" seasonably or risk having their request for transfer dismissed. *W. Va. Trial Court Rule* XVII, (which concerns the disqualification and temporary assignment of circuit court judges) recognizes the importance of the seasonable filing of motions for disqualification. *Taylor County Comm'n. v. Spencer*, 169 W.Va. 37, 285 S.E.2d 656 (1981). Other jurisdictions that allow similar peremptory challenges have routinely held that an untimely affidavit of prejudice should be dismissed. *Crompton v. Bruce*, 669 P.2d 930 [Wyo.1983]; *See generally* Annot., 73 A.L.R.2d 1238, 1249 (1960). These analogous limitations on transfer instruct our under-

■ Furthermore, this interpretation of *W.Va.Code* 50–4–7 [1980] leaves litigants several avenues of recourse. (1) The litigant who believes that more than one magistrate is prejudiced against him may ask a subsequent magistrate to recuse himself and demand a hearing to show good cause in support of his motion. If the magistrate refuses (2) the litigant may proceed in magistrate court and then appeal the magistrate's judgment in circuit court as a matter of right pursuant to *W.Va.Code* 50–5–12 [1980] and receive a trial *de novo*; or (3) the litigant may bring a writ of prohibition against the magistrate he believes should be disqualified in circuit court. *W.Va.Code* 53–1–1 [1980]. But unlike the peremptory challenge, to obtain a writ of prohibition the litigant must show actual prejudice. The plethora of remedies against magistrate bias weighs against an expansive reading of *W.Va.Code* 50–4–7 [1980]. In short, both simple statutory interpretation and sound policy endorse Magistrate Crouser's position. Given the Pritchards' multiple filing of affidavits, it was within Magistrate Crouser's discretion to decline to recuse himself.

## II

■ The second and by far the most important question presented to us here is whether the circuit court erred in awarding costs against Magistrate Crouser. West Virginia has always subscribed to the common law rule that a judge is not civilly liable for any action taken in the exercise of his judicial duties. When acting in his judicial capacity a judge is immune from civil liability for any and all official acts. *Fausler v. Parsons et als.,* 6 W.Va. 486 (1873); *State ex rel. Payne v. Mitchell,* 152 W.Va. 448, 164 S.E.2d 201 (1968). In this case there is no contention that Magistrate Crouser was not acting in his judicial capacity. Even if one assumes *arguendo* that Magistrate Crouser exceeded his authority, judicial immunity would still protect him: A judicial officer acts inside his jurisdiction even when he acts outside of

his authority. *Stump v. Sparkman* 435 U.S. 349, 356–7, 98 S.Ct. 1099, 1104–5, 55 L.Ed.2d 331 (1978). Nor can it be argued that Magistrate Crouser is not entitled to judicial immunity because his court is not of record. Judicial immunity applies to both superior and inferior courts. *Fausler v. Parsons et als.,* 6 W.Va. at 490–1. Accordingly, this Court holds that judicial immunity insulates Magistrate Crouser from the circuit court's award of costs.

Judicial immunity's continuing vitality reflects in part its noble provenance as part of our common law inheritance. Yet despite the doctrine's ancient roots, judicial immunity has flourished rather than withered in American soil. Justice Field issued an early, yet still authoritative, enunciation of the principles of judicial immunity in *Bradley v. Fisher,* 80 U.S. 335 [13 Wall.], 20 L.Ed. 646 (1871).

> The principle, therefore, which exempts judges ... from liability in a civil action for acts done by them in the exercise of their judicial functions, obtains in all countries where there is any well-ordered system of jurisprudence. It has been the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country.

*Bradley,* 80 U.S. at 347.

Not only have these principles stood the test of time, but also they have gained strength through a series of U.S. Supreme Court opinions over the last two decades.

These opinions, while endorsing judicial immunity, have considered the extent to which the civil rights laws have weakened the ancient doctrine. In *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Court held that a judge is immune from damages for false conviction. The immunity applies even if a judge is accused of acting maliciously and corruptly. 386 U.S. at 554, 87 S.Ct. at 1218. In *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), the Court

---

standing of the case before us. Although these cases interpret statutes different from *W.Va. Code* 50–4–7 [1980], they demonstrate a consist-

ent policy of putting some limitation on what is otherwise a peremptory right to transfer.

held that a judge is immune from damages resulting from his *ex parte* sterilization order. Although the U.S. Supreme Court has recently allowed an award of attorneys' fees against judges, the Court has abrogated judicial immunity *only* once, and then only in response to a clear and unambiguous federal statutory command to award fees. *Pulliam v. Allen*, 466 U.S. 522, 104 S.Ct. 1970, 1974, 80 L.Ed.2d 565 (1984). *Pulliam* carves out a narrow exception to otherwise blanket immunity because Congress provided this unique, narrow exception in 42 U.S.C. 1988 (1982). Such an exception, however, does not exist under our State's statutory law.

### III

In its discussions of judicial immunity the U.S. Supreme Court has identified three major policy grounds for shielding judges from civil liability: (1) the preservation of judicial independence; (2) the need for finality in lawsuits; and, (3) the existence of another remedy against judicial excess in the form of appellate review. The first two grounds concern the benefits of judicial immunity; the third ground shows that judicial liability is not essential to protect the public from judicial excess. When considered in *toto,* these grounds make a compelling case for an undiminished doctrine of judicial immunity.

Independence is one of the judiciary's hallmarks. Any doctrinal change that would jeopardize this independence must be approached with circumspection. We share the U.S. Supreme Court's concern that if judges are made liable for their decisions, they will lose their ability to act independently. Justice Field explained:

For it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to everyone who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that

independence without which no judiciary can be either respectable or useful. As observed by a distinguished English judge, it would establish the weakness of judicial authority in a degrading responsibility.

*Bradley v. Fisher,* 80 U.S. at 347.

Additionally, the Court noted that judicial immunity exists not so much for the benefit of judges but rather to protect the public. "... whose interest it is that the judges should be at liberty to exercise their function with independence and without fear of consequences." *Scott v. Stansfield,* L.R.3 Ex. 220, 223, (1868), quoted in *Bradley v. Fisher,* 80 U.S. at 349, n. at 350; *see also Pierson v. Ray,* 386 U.S. at 554, 87 S.Ct. at 1217.

This Court has adopted a similar line of analysis:

No man can see the disastrous consequences of a precedent in favor of such a suit. Whenever we subject the established courts of the land to the degradation of private prosecution, we subdue their independence and destroy their authority. Instead of being venerable before the public, they become contemptible; and we thereby embolden the licentious to trample upon everything sacred in society, and to overturn those institutions which have hitherto been deemed the best guardians of civil liberty.

*Fausler v. Parson et als.,* 6 W.Va. at 491 (Quoting Chief Justice Kent). Quite frequently, the cases requiring the greatest degree of judicial independence are the cases that are the most hotly contested and most controversial. If judges were civilly liable for their decisions, they would shrink from unpopular decisions. A judge without immunity is a judge without power.

To preserve judicial independence, we draw judicial immunity broadly. This reasoning is analogous to the reasoning that both the Supreme Court of the United States and this Court have used in libel cases. Libel cases often present a conflict between an individual's right to privacy, or his right to be free from injury, and the public's right to free speech as provided by the First Amendment. Accordingly, a de-

vice that screens legitimate First Amendment activity from irresponsible or sham First Amendment activity provides the mainstay of any coherent libel doctrine. Courts have great difficulty in fashioning such a device. This difficulty is exacerbated by a behavioral phenomenon known as the "chilling effect."[3] Activities protected by the First Amendment are vulnerable; they must be protected not only from capricious judgments but also from the threat of litigation *per se*. Even if a libel defendant believes he can prevail in court on *the merits*, the potential costs of defending a suit are often enough to deter him from the illumination of public wrongs. *New York Times Company v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964). Indeed, the costs of defending a single libel suit are sufficient to send many publications and individuals reeling into bankruptcy.[4] Both the U.S. Supreme Court and this Court have shared the concern that the costs of defending libel suits are enought to force many publications to engage in "self-censorship." *New York Times Company v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26; *Sprouse v. Clay Communication, Inc.*, 158 W.Va. 427, 454, 211 S.E.2d 674, 690 (1975) *cert. denied* 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 311 (1975) *reh'g. denied* 423 U.S. 991, 96 S.Ct. 406, 46 L.Ed.2d 311 (1975). To prevent self censorship, the courts have drawn First Amendment protections in a broad and generous manner.

Yet we also understand that our liberal interpretation of the First Amendment will cause some individuals to be hurt by statements that are false. In the First Amendment area, however, the courts have no choice but to balance individuals' rights to privacy and freedom from injury with society's interest in a robust public debate through the free flow of information. We opt for robust debate. The U.S. Supreme Court explained:

"The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, *that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great.* The public benefit from publicity is so great, and the chance of injury to private character so small, that such discussions must be privileged." *Coleman v. MacLennan* 18 Kan. 11, 723, 98 P. 281, 285 (1908). Quoted in *New York Times Co. v. Sullivan*, 376 U.S. at 281, 84 S.Ct. at 726 [Emphasis Ours].

Both a vigorous press and free speech are chimerical if publishers and individuals are open to vexatious and harassing law suits.

In the present case we make a similar choice. We do not pretend that judges behave like Plato's philosopher kings, attuned only to the form of the good and undistracted by man's baser appetites. But the uncomely vision of a judiciary hamstrung by civil liability compels us to reaffirm the strength and vitality of judicial immunity. For even if judges knew they could prevail in suits filed by disgruntled litigants, the threat of *litigation per se*, as in libel suits, is enough to chill even the most steely judge in the performance of his duties.

But judicial immunity does more than insulate the judiciary, it also provides finality in lawsuits. Without judicial immunity judges would be potentially liable to the losing party in every lawsuit they decide. The effect of harassing and vexatious litigation upon judges should not be underestimated. As stated in *Bradley:*

If upon such allegations a judge could be compelled to answer in a civil action for his judicial acts, not only would his office be degraded and his usefulness destroyed, but he would be subjected for

---

3. Tribe, *American Constitutional Law*, 634, 641–2 (1978).

4. The cost of defending a full-fledged libel suit begins at about $20,000; the successful defense of the celebrated *Rosenbloom v. Metromedia,* *Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) case cost nearly $100,000. Tribe, *American Constitutional Law*, 642 n. 25 (1978) *citing* Anderson *"Libel and Press Self Censorship"* 53 Tex.L.Rev. 422 (1975).

his protection to the necessity of preserving a complete record of all the evidence produced before him in every litigated case, and of the authorities cited and arguments presented, in order that he might be able to show the judge before whom he might be summoned by the losing party—and that judge perhaps one of an inferior jurisdiction—that he had decided as he did with judicial integrity; and the second judge would be subjected to a similar burden, as he in his turn might also be held amenable by the losing party.

*Bradley v. Fisher*, 80 U.S. at 349.

The losing party in a lawsuit could indefinitely forestall judgments rendered against him by suing the tribunal which tried his case. An already crowded docket would swell with suits against judges. These suits would become an additional procedural layer that all litigants must cut through before they could obtain justice, and this new procedural layer would saddle the courts with a new set of costs that they are ill equipped to shoulder. Because judges are state employees the public would pay the direct costs of defending suits and of paying most judgments against judges. Yet these direct costs are only the tip of the cost iceberg. Beneath the surface lurks the true cost juggernaut: the public pays for the bench time a judge would lose while forced to defend himself; the public pays for the time a judge would spend engaging in wasteful measures to guard against potential liability. Additionally, this lost judge time would further crowd already congested dockets. The courts are notoriously understaffed and backlogged; we see no reason to pile Pelion upon Ossa.

No one should doubt that these added strains on the court system would go unalleviated. In these tight fiscal times it is patently unrealistic to expect financial succor or an expanded court system from the legislature.[5] Judge time is a limited resource. A weakened rule of judicial immunity would both increase the demand for court resources and contract the supply. The net result would be a lengthening of the queue at the courthouse door which creates one further barrier to entry for the poor into the legal system. By giving losing litigants the right to sue their judge, we allow well financed litigants to sue endlessly and thus provide them with a cudgel to hold over the heads of honest judges. A weakening of finality would cause wide-ranging systemic effects that would extend beyond the mere games of cat and mouse between two litigants and would readjust the power relations between all the participants in the legal system.

## IV

■ The Pritchards have suggested that *W.Va.Code* 53-1-8 [1981][6] allows us to award costs against Magistrate Crouser. The Pritchards cite *Pulliam v. Allen, supra* in support of this proposition. In *Pulliam* the Court enjoined a Virginia magistrate from incarcerating persons waiting for trial on non-jailable misdemeanors if the defendant could not raise bail and awarded costs and attorneys' fees against a magistrate pursuant to 42 U.S.C. 1988 (1982). But the U.S. Supreme Court noted that the common law principle of judicial immunity would "... not be abrogated absent clear legislative intent to do so." *Pulliam v. Allen*, 466 U.S. at 529, 104 S.Ct. at 1974. Although the Supreme Court found that the Congress[7] intended 42 U.S.C. 1988 (1982) to permit attorneys' fees awards and costs in cases in which *prospective*, injunc-

---

5. *See* R. Neely, *Why Courts Don't Work* 16, 80, 83–4 (McGraw-Hill, New York 1982).

6. *W.Va.Code* 53-1-8 [1981] provides: The writ peremptory shall be awarded or denied according to the law and facts of the case, and with or without costs, as the court or judge may determine.

7. H.R.Rep. No. 94-1558, p. 9 (1976) "[W]hile damages are theoretically available under the statutes covered by H.R. 15460, it should be observed that, in some cases, immunity doctrines and special defenses, available only to public officials, preclude or severely limit the damage remedy. Consequently awarding counsel fees to prevailing plaintiffs in such litigation is particularly important and necessary if Federal civil and constitutional rights are to be adequately protected." *Quoted in Pulliam v. Allen*, 466 U.S. at 527–528 n. 4, 104 S.Ct. at 1973 n. 4.

tive relief pursuant to 42 U.S.C. 1983 (1982) was properly awarded against a judge, we cannot say the same about the legislative intent behind *W.Va.Code* 53–1–8 [1981]. As the U.S. Supreme Court held in *Pierson v. Ray*, judicial immunity is so well established that Congress would have to provide specifically for the doctrine's abolition before the Court would hold a judicial officer civilly liable. 386 U.S. at 555, 87 S.Ct. at 1218. *W.Va.Code* 53–1–8 [1981] does not contain any such specific abolition and thus cannot overcome the presumption in favor of judicial immunity.

A brief history of *W.Va.Code* 53–1–8 [1981] supports our decision. Although *W.Va.Code* 53–1–8 [1981] has been used to award costs in mandamus proceedings where a public officer has wilfully failed to obey the law, *see, e.g. State ex rel. Board of Education v. Cavendish*, 81 W.Va. 266, 94 S.E. 149 (1917); *Nelson v. W.Va. Public Employees Ins. Bd.*, 171 W.Va. 445, 300 S.E.2d 86, 34 A.L.R. 4th 438, (1983), it has never been used to award costs against a judicial officer in proceedings involving a writ of prohibition. This Court will not expand the purview of *Code* 53–1–8 [1981] here. We have invoked the authority of *Code* 53–1–8 [1981] to reimburse individual citizens for costs borne when government inaction has forced them to resort to lawsuits to compel the executive branch to perform its legally prescribed nondiscretionary duties. *Nelson v. W. Va. Public Employees Ins. Bd.*, 171 W.Va. at 451, 300 S.E.2d at 92; *Meadows v. Lewis*, 172 W.Va. 457, 307 S.E.2d 625, 644 (1983). And we have awarded costs when the officers of the executive branch have knowingly disregarded their duty to execute the law. But we have not awarded costs against executive branch officers proceeded against in mandamus who have honestly and in good faith endeavored to perform their duties as they perceived them. *State ex rel. Koontz v. Board of Park Comm'rs.*, 131 W.Va. 417, 47 S.E.2d 689 (1948). *State ex rel. Board of Education v. Cavendish*, 81 W.Va. at 268, 94 S.E. 149. Because the duties of the executive branch are clear, the court can discern when executives act in good faith and when they act in disregard of the law.

Distinctions based on the presence of good faith are hard to make, however, when we examine the conduct of judges acting within their judicial capacity. When a judge is asked to interpret the law, he is not acting like an executive with a legislative mandate that he must carry out. Rather, a judge is asked to give his independent interpretation of the law. "He is not bound, at the peril of an action for damages, or personal controversy, to decide right, in matters either of law or fact; but to decide according to his own convictions of right, of which his recorded judgment is the test, and must be taken to be conclusive evidence." *Fausler v. Parsons et als.*, 6 W.Va. at 491. It is impossible to divine the motives of a judge when he performs any sort, form, kind or description of judicial act. His internal mental state is inscrutable. The only thing this Court can test is the correctness of a judge's decision. "Good faith" and "bad faith" are beside the point. Because we can examine his holding, and not his internal mental process, the proper remedy against a judge who is acting in his judicial capacity is judicial review and not a fine, no matter how the fine may be characterized, and no matter how insignificant the sum.

Not only are lower court judges restrained by judicial review of their decisions, West Virginia also has a *Code of Judicial Ethics* and an elaborate enforcement arm to curb arbitrary or lawless behavior. The extent to which an argument in favor of judicial liability is compelling is undermined by these two curbs on judicial conduct that exist among few other potential tort feasors. Although some outrageous behavior slips through the system of precautions, the alternative is more gruesome.

Neither this Court's previous interpretations of *W.Va.Code* 53–1–8 [1981], nor sound policy, supports the award of costs. Because *W.Va.Code* 53–1–8 [1981] does not surreptitiously displace common law judicial immunity, it does not entitle the Pritchards to costs against Magistrate Crouser.

Although it is tempting to draw a line between "costs" and "civil liability for damages," this Court finds the distinction untenable. Judicial immunity in West Virginia is absolute.

Certified Questions Answered.