**Ignacio Gual MORALES, Plaintiff,**

v.

**Pedro Hernandez VEGA, Director Puerto Rico Aqueduct and Sewer Authority, et al., Defendants.**

**Civ. Nos. 76–104, 76–134.**

United States District Court,
D. Puerto Rico.

Dec. 21, 1979.

.John L. A. De Passalacqua, Isla Verde, P. R., for plaintiff.

Rafael· Géigel, Hato Rey, P. R., for defendants; Chapman, Duff & Paul, Washington, D. C., on brief.

## . DECISION AND ORDER

TORRUELLA, District Judge.

Once again this civil rights action is before us on a Defendants' Motion to Dismiss.[1] The facts have been stated before, see below note 1, but to place the present Motion in its proper context they once again bear repeating.

Plaintiff was an employee of the Puerto Rico Aqueduct and Sewer Authority (P.R.A.S.A.). As alleged, he was ordered on June 13, 1974 to carry out a field study for a project to be undertaken by P.R.A.S.A. To perform this study Plaintiff was to have used his own automobile, on future reimbursement for mileage. This was as provided by the Collective Bargaining Agreement in effect between P.R.A.S.A. and the Union which represented the workers at P.R.A.S.A.[2] Plaintiff's direct reply to this Order was that he could not use his personal automobile because it had been withdrawn from P.R.A.S.A.'s mileage authorization.[3] He

---

1. The result of an earlier Motion to Dismiss is set out at *Gual Morales v. Hernández Vega*, 579 F.2d 677 (C.A. 1, 1978); *Morales v. Vega*, 461 F.Supp. 656 (D.P.R.1978); *Gual Morales v. Hernández Vega*, 604 F.2d 730 (C.A. 1, 1979).

2. The Collective Bargaining Agreement in effect at the time provided in its Article XVI: "When an employee covered by this agreement is required to work outside the limits of his official work station the authority will provide him with transportation or it will reimburse him the cost for this concept at the rate of twenty ($0.20) cents for each mile . . . ." See Exhibit I Defendants' Motion to Amend Memorandum . . . , June 27, 1979. See also: Aff. Pérez Ríos, March 9, 1977, Exhibit 1.

3. This is a disputed point. The material before us reveals that Plaintiff's formal request to have his automobile withdrawn from the mileage authorization list is dated June 13, 1974,

did, however, state that he would be willing to perform the project in any transportation provided by P.R.A.S.A. See Rios Aff. Exh. II; see also Rosa Aff., March 9, 1977, Exh. 11A. The reply carries the same date as the Order. The following day, June 14, 1974, Plaintiff was informed in a detailed letter that he was dismissed from his employment.

Plaintiff's refusal to carry out his work assignment, does not, however, arise in a vacuum. Other related events should be mentioned. Since at least the latter part of 1973 certain discontent had arisen within the ranks of those field employees of P.R.A.S.A. who were obligated by the terms of the Collective Bargaining Agreement to use their personal automobiles in performing their duties with respect to mileage rates and other reimbursements. As early as November 26, 1973 several field workers had already petitioned P.R.A.S.A. for a revision of these rates. To these requests P.R.A.S.A. had replied that it would study the proposals, but that, because these rates were fixed by the Collective Bargaining Agreement, this was a matter best left for negotiation during the next bargaining session. As a continuation of this dispute, on June 6, 1974, or seven days before Plaintiff's incident with P.R.A.S.A. officials, the Union held an extraordinary assembly adopting a resolution wherein it petitioned P.R.A.S.A. not to ask field workers to use their personal automobiles until an adequate readjustment was made on the reimbursement rates. The next day, June 7, 1974, Neftalí Rosa, Area Director of Industrial Relations at P.R.A.S.A. and a Defendant herein, replied by letter informing the Union that after this resolution had been passed several field workers in several departments had refused to use their personal automobiles in performing their duties. He further informed the Union that the proper procedure for airing the dispute was by filing a complaint with the Grievance Committee as provided for by the Collective Bargaining Agreement. A second reaction to the Union's resolution was a Memorandum sent by the Executive Director of P.R.A.S.A., also a Defendant herein, to all Union members. This memorandum reiterated that Union members should comply with their obligations under the Collective Bargaining Agreement, P.R.A.S.A. Regulations, Law 142 of 1961 [4] and other applicable administrative regulations. It is in the context of these earlier events that Plaintiff refused to carry out his work assignment and was subsequently dismissed.

Two weeks after his dismissal Plaintiff filed a complaint with the Grievance Committee of P.R.A.S.A., see Appendix I. After hearings were held on October 22, 1974, March 1, 1975 and March 24, 1975 the Committee issued its findings and conclusions wherein by a 3 to 2 vote it affirmed the dismissal of Plaintiff on the grounds of neglect of duty. See Appendix II.

On these facts Plaintiff filed the present action under 42 U.S.C. § 1983 and § 1985 claiming a violation of his First Amendment rights to freedom of speech and association and Fifth Amendment rights to due process of law. As expressed by the Court of Appeals the named Defendants fall into two groups. See 579 F.2d at p. 678. "Defendants Hernández Vega, Pagán Colberg, Rosa Rodríquez, Pérez Ríos, and Gil Veláquez are all P.R.A.S.A. supervisory personnel. These Defendants are accused primarily of obtaining Plaintiff's dismissal. That occurred on June 14, 1974. The second group of defendants—López Ruiz, Calderón Santiago, and Arroyo—are three members of the five person P.R.A.S.A. Grievance Committee; each of these Defendants voted to affirm Plaintiff's dismissal. The first two are the two management representatives on the Committee. Arroyo, President of the Committee is the neutral member appointed by the Puerto Rico Secretary of Labor." *Id.* After two years of exclusively litigating the limitations ques-

the same date he was given his work assignment. This request was denied on June 14, 1974. See Rosa, Aff. Exhs. 12, 13.

4. 29 L.P.R.A. §§ 481–499. We shall make a detailed reference to this statute in our later discussion of the pending Motion.

tion, that issue has finally been put to rest. See Note 1. The complaint is untimely as to the first named group of Defendants. These Defendants no longer figure in the outcome of this litigation. The Motion to Dismiss filed by the second group of Defendants is predicated on a novel and interesting twist to the long accepted principle that judicial officers are immune from suits for acts done within their judicial function.[5] These three Committee members would equate their function to that of a judicial officer. On the unique and particular facts before us we find validity to this argument and explain as follows.

It is now firmly settled in civil rights jurisprudence that public officials acting in their official capacity enjoy either a qualified or an absolute immunity from suits on damages. Which type of immunity is granted to a particular official generally depends upon the type of public function performed by the particular official, and the degree of good faith belief of the official that his action was necessary. See gen.: Developments in the Law—Section 1983 and Federalism, 90 Harv.L.Rev. 1133 (1977). Thus, for example, school administrators,[6] governors,[7] hospital directors,[8] prison officials [9] and policemen [10] have been granted a qualified immunity in these types of suits. In a civil rights action against this type of an official "a plaintiff must *allege* and *prove* that a public official acted in bad faith to state a valid cause of action." *Gómez v. Toledo*, 602 F.2d 1018, 1020 (C.A. 1, 1979) (underline ours). Conversely, public policy dictates that other types of public officials be granted an absolute immunity to insure a certain unintimated independence of action. Thus, legislators,[11] prosecutors,[12] and judges [13] have been granted this more complete type of immunity. Because the remaining Defendants claim the absolute immunity of a judge, it is on this type of official that our analysis is directed.

"Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for

---

5. Plaintiff in his opposition argues that the question of immunity is one that should be faced after the facts, and especially the credibility, are established. He relies on the statement made by the Court of Appeals in the first *Gual Morales* decision to the effect that as to the three remaining defendants summary dismissal was precluded: ". . . there are sufficient questions concerning the existence of a conspiracy against Plaintiff and the motives behind the three grievance committee member defendants to entitle Plaintiff to proceed with his action against them." 579 F.2d 681. We disagree with the interpretation Plaintiff ascribes to the Court of Appeals' ruling. In the context of a summary judgment on the merits it is now clear that "motive" and "state of mind" will necessarily be in issue until one version of the facts is accepted in place of the other. The procedurally correct manner for this determination would be after trial; hence the Court of Appeals' ruling. However, a claim of immunity from suit is a legal issue not reaching the merits of any particular claim. Moreover, when it properly applies a claim of ". . . absolute immunity defeats a suit at the outset . . ." *Imbler v. Pachtman*, 424 U.S. 409, fn. 13, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). And lastly, it is *clear* that in reaching their conclusion the Court of Appeals ". . . express[ed] no view as to . . . whether any other defense or defenses may be viable." 579 F.2d 677 at n. 3.

6. *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

7. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

8. *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

9. *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

10. *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

11. *Tenney v. Brandlove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1971); see also: *Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979).

12. *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

13. *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); see also: *Bradley v. Fisher*, 349, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872); *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1976); cf. also absolute immunity of a juror: *McIntosh v. Garofolo*, 367 F.Supp. 501 (D.Pa.1973).

acts committed within their judicial jurisdiction . . .." *Pierson v. Ray,* 386 U.S. at 553, 87 S.Ct. at 1217. Because § 1983 liability "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions", *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), the Supreme Court found no reason why this traditional tort law immunity could not equally apply in civil rights damage actions. *Pierson v. Ray,* supra. Essentially the basic policy considerations are identical. The present rule is that a judge is absolutely immune from suit unless it can be shown that he has acted in the "clear absence of all jurisdiction." *Stump v. Sparkman,* 435 U.S. at 356–57, 98 S.Ct. at 1101. "This immunity applies even when the judge is accused of acting maliciously and corruptly, and it 'is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest is that the judges should be at liberty to exercise their functions with independence and without fear of the consequences.'" *Pierson v. Ray,* supra, 386 U.S. 553–554, 87 S.Ct. 1218 (citation omitted). Having stated so much, the pivotal question before us becomes not whether judges are immune, or under what type of immunity they are cloaked, but rather whether the remaining Defendants herein, members of the Grievance Committee, were judges when they handed down their decision and thus entitled to invoke this particular defense.

█ In our examination of the function and role of the Grievance Committee we are guided by the analysis set out in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1977).[14] *Butz* specifically holds that absolute immunity is not confined to judicial officers or the judicial branch of government. The Court therein extended this defense to individuals performing quasi-judicial and quasi-prosecutorial type functions within the Department of Agriculture.[15] Thus, under *Butz,* depending upon the particular factual framework an absolute immunity also extends to those whose powers and purpose are "'functionally comparable' to that of a judge." *Id.* at p. 513, 98 S.Ct. at p. 2914. Compare also absolute immunity extended to quasi-legislative officers recognized recently in *Lake Country Estates v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979).

The structure of, and the procedure to be followed by, the Grievance Committee was set by Law 142 of June 30, 1961, 29 L.P. R.A. §§ 481–499, see esp. §§ 485–495; see note 19, infra. In the context of either ordinary civil dispute resolution or specialized labor arbitration the procedural mechanism employed is *sui generis.* The Supreme Court of Puerto Rico has labelled it "compelled arbitration by legislation."[16] *Colón Molinary v. Puerto Rico Aqueduct and Sewer Authority,* 103 D.P.R. 143, 145–46 (1974). At the same time, however, its "quasi-judicial"[17] makeup shares attributes of traditional judicial process, of governmental administrative adjudication and of private arbitration. Under the framework set out by the law which establishes the Grievance Committee these three forms of dispute adjudication uniquely converge.

First, procedure before the Grievance Committee is adversary in nature. Under section 6 of the Act, 29 L.P.R.A. § 486, "The Grievance Committee shall have power to

14. Unfortunately neither party has cited or otherwise analyzed the particular facts before us under the *Butz* rationale.

15. Specifically the Hearing Examiner, the Judicial Officer, and prosecuting Staff Attorney.

16. The phrase used by the Court is "arbitraje compulsorio legislativo." The translation that appears above is ours. We realize that there may be other accepted literal forms to express this idea. Although not a word for word translation the phrase we have adopted best conveys the spirit and intent of what the Supreme Court meant, i. e., the difference between arbitration that is compelled by agreement of the parties and arbitration that is compelled by public statute. See *Colón Molinary,* supra, at n. 1.

17. Again a phrase used by the Supreme Court of Puerto Rico in describing characteristics of this compelled arbitration. *Colón Molinary,* supra p. 152.

hold hearings, administer oaths, subpoena witnesses, issue summonses and require all such information or evidence as it may deem necessary to settle disputes." In this same vein government agencies are instructed to make available "all records, documents, and reports in their possession bearing upon any matter before the Committee." 29 L.P.R.A. § 489. Also, similar to what is the case under general administrative law and under some arbitration statutes the disobedience of a Committee's subpoena, upon proper certification to a Superior Court, is punishable as contempt. 29 L.P.R.A. § 487. Under the Act the controversy in question is placed before a panel "of an equal number of members from both parties and presided over by an outsider unanimously chosen by said committee. Should the Committee fail to agree as to the selection of such outsider . . . the same shall be designated by the Secretary of Labor." 29 L.P.R.A. § 485. After the Committee has held hearings and heard the dispute it:

" . . . shall reduce to writing its findings of fact and shall submit the pertinent decision on the matters object of the dispute." 29 L.P.R.A. § 490.

The decision of the Committee "shall be by the majority and shall be final and binding upon all parties." 29 L.P.R.A. § 490. "A copy of the decision is to be provided to each party to the dispute and to the Secretary of Labor." 29 L.P.R.A. § 493.

 Unlike other types of arbitration, and indeed a luxury not conferred on all disputes brought in the Courts of General Jurisdiction of Puerto Rico, review and enforcement of Grievance Committee decisions is had directly in the Supreme Court of Puerto Rico. Section 14 of the Act, 29 L.P.R.A. § 494, provides:

"Arbitration decisions issued pursuant to the provisions of this chapter may be put into effect by the Supreme Court of Puerto Rico either by legal action brought by any of the parties or through the procedure established by the Puerto Rico Labor Relations Act in its section 9, subsection 2, clause (c) [section 70(2)(c) of this title]" [18]

In reviewing an arbitration decision entered under the statute involved herein the Supreme Court of Puerto Rico has observed: "An arbitration award stands in a position very similar to that of a judicial judgment or decree." *Colón Molinary,* supra, at fn. 5, citing *Ríos v. Puerto Rican Cement Corp.,* 66 P.R.R. 446, 453 (1946). And although the standard of review may in form differ slightly, the same protection present in judicial review of lower court decisions is nevertheless present in judicial review of Grievance Committee decisions. The Supreme Court will review a Grievance Committee award in a manner similar to the general rule applied in other types of arbitration awards, i. e., arbitration awards will not be disturbed on law or fact unless the parties have previously agreed in the collective bargaining agreement or in the submission to arbitration that the dispute should be decided according to law.[19] See *Colón Molinary,* supra, p. 155; see also: *Labor Relations Board v. Cooperativa Cafeteros,* 89 P.R.R. 487 (1963); *Labor Relations Board v. N.Y. & P.R.S.S. Co.,* 69 P.R.R. 730 (1949). However, the fact that judicial review of an arbitration award is somehow conditioned does not take away from the fact that the award emanates from an adjudicative process which in principle is "functionally comparable to [the process employed by] a judge." This is so because the scope of judicial review of decisions rendered by lower courts or administrative agencies are in a sense always limited. Thus, for example, in ordinary civil litigation a reviewing court is generally bound by

---

18. 29 L.P.R.A. § 70(2)(c) grants the Puerto Rican Labor Relations Board the power to petition the Supreme Court for enforcement of an arbitration decision. Compare 29 U.S.C. § 160(e).

19. This is not different from what is the rule in judicial review of arbitration awards under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, see gen.: the *Steelworker's Trilogy cases,* 363 U.S. 564, 574, 80 S.Ct. 1343, 4 L.Ed.2d 1403, 80 S.Ct. 1347, 4 L.Ed.2d 1409 and 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

the findings of fact of the lower court, Rule 52(a), Fed.R.Civ.P. Compare also the scope of review in appeals from determinations made by the National Labor Relations Board, 29 U.S.C. § 160(e); review from determinations of the Secretary of Health, Education and Welfare, 42 U.S.C. § 405(g); general judicial review under the Administrative Procedure Act, 5 U.S.C. § 706; and judicial confirmation of arbitration awards under the Federal Arbitration Act, 9 U.S.C. §§ 1, 8. Under *Butz v. Economou,* the fact that the reviewing court's scope of action is technically limited in no way strips from the original trier of fact the recognized absolute immunity.

■ Moreover, in this same context, we cannot help but note that the Grievance Committee's decision in Plaintiff's case could in effect have been impeached by resort to judicial review. Arbitration awards such as these may be impeached because of "(1) fraud, (2) misconduct, (3) lack of due process in the conduct of a hearing, (4) violation of public policy, (5) lack of jurisdiction, and (6) want of entirety." *Labor Relations Board v. Cooperativa Cafeteros,* 89 P.R.R. 487, 490 (1963); *Colón Molinary,* supra, p. 185. If Plaintiff's claims had merit then surely factors 1, 2 and 3 would be applicable. But the fact that on review or appeal Plaintiff may prove that the action of the arbitrator was in error, malicious, or was in excess of his authority, or otherwise show that his cause should clearly have prevailed does not affect the immunity of the trier. *Stump v. Sparkman,* 435 U.S. at pp. 356–57, 98 S.Ct. 1099. "A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." *Id.* at p. 350, 98 S.Ct. at p. 1106.

■ In conclusion, on the record before us, we find that the statute which creates the Grievance Committee [20] vests the appointed arbitrators with quasi-judicial characteristics so as to make them "functionally comparable" to judges. Because there is no allegation before us that the arbitrators herein exceeded their jurisdiction these arbitrators are entitled to immunity from suit for acts performed as arbitrators. See: *Cahn v. International Ladies' Garment Union,* 311 F.2d 113 (C.A. 3, 1962); see also: *Tamari v. Conrad,* 552 F.2d 778 (C.A. 7, 1977).

■ Dismissal has also been sought by the Defendant P.R.A.S.A. Although not a Defendant in the original complaint filed on January 30, 1976, it was made one by the amended complaint of October 17, 1978. Essentially, this Defendant argues that on the allegations of the complaint it may not be held liable, for any relief sought, via the doctrine of *respondeat superior.* Irrespective of whether P.R.A.S.A. is a person within the meaning of the civil rights statute (see *María Santiago v. Corporación de Renovación Urbana Y Vivienda de Puerto Rico,* 554 F.2d 1210 (C.A. 1, 1977)) or whether it can technically conspire with other immune officials (see *Kermit Construction Corp. v. Banco Crédito y Ahorro Ponceño,* 547 F.2d 1 (C.A. 1, 1977)) on the basis of a close examination of the allegations found in the amended complaint we find merit in this argument. No paragraph in the complaint specifically imputes that Plaintiff's harm resulted from any act committed individually by P.R.A.S.A., or from any official policy or custom that was adopted by it. Because the complaint only alleges that the injury was caused by the acts of its individ-

---

**20.** We are not unaware that the statute which created the Grievance Committee has recently been repealed by Law Number 73 of June 16, 1977. This does not affect the outcome. First, the reasons for the repeal have nothing to do with factors that are dealt with in this case, see: *Puerto Rico Aqueduct and Sewer Authority v. Union of the Employees of Puerto Rico Aqueduct and Sewer Authority,* 105 D.P.R. 437 (D.P.R.); and the Statement of Motives of Law

73. Second, the fact that a court or other "functionally comparable" adjudicative body is abolished is no reason to deny it immunity for the period when it did exist and function. We see nothing in *Bradley v. Fisher, Pierson v. Ray, Stump v. Sparkman,* or *Butz v. Economou,* that would indicate that a different result would have been reached if the courts or agencies involved in those cases were later abolished.

ual employees, P.R.A.S.A. cannot be found liable. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1958); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Plaintiff's argument that this action may continue because the only remedy sought against this Defendant is reinstatement misses the mark. No remedy can be entered in favor of a plaintiff against a defendant as to which no sufficient cause of action is stated or, more so, as to which no wrongdoing has been alleged. This necessarily follows in any case where *respondeat superior* is not sufficient to find liability. *Rizzo v. Goode,* supra. Lastly, we note in closing that, even assuming a viable cause had been stated against this Defendant, Plaintiff has failed to explain why a suit which is time barred against the employees of P.R.A.S.A. is not also time barred against P.R.A.S.A. itself. See note 1, supra.

For all the above cited reasons the amended complaint is hereby DISMISSED. The Clerk of the Court shall enter Judgment accordingly.

IT IS SO ORDERED.

## APPENDIX I

Translation

BEFORE THE

COMPLAINTS COMMITTEE

ACQUEDUCTS AND SEWERS AUTHORITY

604 BARBOSA AVE., HATO REY, P. R.

BROTHERHOOD OF PROFESSIONAL EMPLOYEES A.S.A. (Brac - AFL - CIO) Complainant )

vs. )

ACQUEDUCTS AND SEWERS AUTHORITY OF PUERTO RICO Defendant )

Complaint No: 74-3

Filing Date Thursday, June 27, 1974

Re: Summary Destitution

### C O M P L A I N A N T

1. Complaint filed by / / Employee /X/ Union /./ A.S.A.

2. Name of the employee: Engineer Ignacio Gual Morales

3. Postal address of the Employee: 313 Juncos St., Villa Palmares, Sant. P.R.-00915

4. Title of the position: Engineer III

5. Office where he works: Division for the design of urban acqueducts

### C O M P L A I N T

6. FACTS (Explain in details: give dates, hours, places, names of witnesses and their addresses, etc. Enclose additional paper if necessary).

See attached page

7. REQUESTED REMEDY (Explain): _____

See attached page

8. GROUNDS FOR REQUESTED REMEDY (Explain): _____

~~See attached page~~

CERTIFIED:
~~To be a correct translation prepared by:~~

_ZZgcl_

Official Court Interpreter and Translator
United States District Court
for the District of Puerto Rico

IGNACIO GUAL MORALES (sgd.)
Signature of the Employee
(Complainant)

Represented by:

Notified:

(signature illegible)

(illegible)

27 of June of 1974

UNION
(Union or A.S.A.)

JULIO CESAR GOMEZ (sgd.)
Signature of the Representative

Pres. H.E.P. A.S.A. (Brac-AFL-CIO)
l President

—1—

## 6. FACTS:

1. On Thursday, June 13, 1974, I sent a memorandum to Mr. Adolfo Criscuolo, Director of the Administration and Finances Area, where I told him to vacate my travel authorization 866, effective on the date of May 17, 1971 and in said memorandum I did not explain my reasons. A copy of this memorandum was given to Mr. Miguel A. Pérez Rios, Acting Chief of the Urban Acqueducts Division for his knowledge.

2. On that same Thursday the 13th I received from Eng. Miguel A. Pérez Rios, Acting Chief of the Urban Acqueducts a memorandum where he indicated to me that I had to travel in my private car and that I had to take Eng. George Castelblanco in said car to the place of the proyect at Camarones Ward in Guaynabo on the 14th of June, 1974, that is, the next day, to make a field study.

3. On the afternoon of the same Thursday, June 13, 1974, through a memorandum, I indicated to Eng. Miguel A. Pérez Rios, Acting Chief of the Urban Projects Division, that I had withdrawn my travel authorization and that I would make the trip by any other transportation means which the Authority would grant me or provide me with. Indicating to him that I was not refusing to do my duties and that I would comply with said orders.

4. On Friday, July 14, 1974, at 3:15 P.M., that is the next day, Eng. Benedicto Gil, Chief of the Urban Project Design Department, handed over to me a letter where I was summarily destituted from my employment as Engineer III in the Urban Projects Design Department by the Administration and where they indicated to me that I had 10 working days to submit a complaint to the Complaints Committee which I am doing through this means.

WITNESSES:

5. The names and addresses will be opportunely notified (since their addresses are being gathered) of said witnesses.

—2—

## 7. REQUESTED REMEDY:

a) That my summary destitution be vacated and that I be reinstated at my job with all the benefits and rights it is entitled to since the day I was dismissed.

b) That the days accrued for annual and sick leave be credited to me and any other type of vacations which may be necessary.

c) That my salary be reinstalled with all the increases reached thru agreements or on the merit level or in any other way.

d) That the Authority be responsible of rewarding and compensating me for all the damages and prejudices that they caused me when they destituted me summarily.

e) Any other remedy for which I have the right pursuant to the collective agreement in effect and the laws in effect.

f) That all correspondence, memoranda, references, documents directly or indirectly related with my destitution be eliminated from my personal file.

g) That everything related with alleged violations incurred in the Resolution issued by the Brotherhood of Professional Employees of the A.S.A. on the 6th of June, 1974, be withdrawn from my file.

h) That all documents, communications, memoranda and references related directly or indirectly with my summary destitution and with alleged violations to the resolution issued by the Brotherhood of Professional Employees of the A.S.A. be eliminated from all kinds of files and existing archives.

—3—

8. *GROUNDS FOR THE REMEDY REQUESTED*

a) Unjustified suspension

b) Illegal dismissal

c) Violation to the collective agreement between the Brotherhood of Professional Employees (Brac-AFL–CIO) and the Acqueducts and Sewers Authority of Puerto Rico.

d) Law 142 of June 30, 1961, collective agreement, Personnel Regulations and Manual of Administrative Proceedings.

e) Any other pleading or statute to which we have a right according to the existing laws; the afore expressed includes any allegation arising in relation to the constitutional guarantees and the Writ of Rights of the Constitution of the Commonwealth of Puerto Rico and the Constitution of the United States of America.

f) I cannot be "forced" to use my private automobile in official duties of the Authority.

g) Due to the reach and repercussion that this unjustified action (my summary destitution) can have over my person, my moral and my professional future, which is in danger of being adversely affected.

4. Without any legal justification whatsoever, the action of the ASA of summarily dismissing petitioner, adversely affects his right to equal employment opportunities, to protection against abusive attacks on his honor and the use and enjoyment of his private property. These are fundamental rights guaranteed by the Constitution of the Commonwealth of Puerto Rico in its article II. It is herein requested that the Complaints Committee include in the remedies to be granted the reimbursement by the ASA of all financial expenses arising from their arbitrary and illegal action. These expenses should include attorney fees, as well as payment to the witnesses and any other expense originating from the preparation and defense of this case.

It is also requested herein, besides, that the Complaints Committee order the civil compensation for the moral damages and mental anguish caused to petitioner by the arbitrary, illegal and malicious action of the ASA.

July 8, 1974 (initialled)
_____
(date of filing)

(sgd.)
IGNACIO GUAL MORALES
_____
Signature of the employee-complainant

NOTIFIED: REPRESENTED BY:

(illegible)
_____ _____
 UNION or ASA

(sgd.)

Director Industrial Relations JULIO CESAR GOMEZ
ASA Signature of the representative

July 8, 1974

Pres. H.E.P. of the A.S.A. (BRAC-AFL-CIO)

---

AMENDMENT TO COMPLAINT NO. 74–3 RE: SUMMARY DESTITUTION, filed on Thursday, June 27, 1974, by the Brotherhood of Professional Employees of the A.S.A., (BRAC. AFL–CIO).

The following facts, remedies and corresponding grounds are added:

1. The action of the A.S.A. constitutes an illegal practice of the work according to articles 4 & 8(1), a, b, c, of the Law of Work Relations. Said action consisted of an illegal intervention with the rights of the employee based on concerted activities. The agreement was violated when it was demanded *compulsorily* the use of the private vehicle for official duties. The agreement in its article 16, of page 51, provides an alternative to that effect. Besides article 6, sec. 3, incise B, was violated, which is self explanatory.

It is herein requested through these facts, that it be declared that the ASA has incurred in illegal practice of work and that the corresponding sanction; according to the legislation in effect, be applied.

2. The summary destitution conveys an unjustified dismissal, according to the referred to facts and grounds. In virtue of the decision taken by the Complaints Committee on its day it is requested that the corresponding sanction be applied to the ASA according to the case of *Beauchamp v. Hotel Dorado* (98 D.P.R., 633).

3. It arises from the facts that the ASA has applied moral coertion for an unjustified dismissal to inhibit the enjoyment to the constitutional right to a free speech and for the affected employee to associate. The remedies mentioned from paragraph a to h are herein requested. Even if there is no statute or law that can be specifically applied, the merits of the case deal with a constitutional guarantee to free speech. According to the case of *Severiano Quiñones v. CPR* ( ) the constitutional rights are self-exercised and do not need any specific statute to be effective. It has to do, besides, with fundamental constitutional rights which can not be implicitly renounced.

---

CERTIFIED:
To be a correct translation prepared by:

*[signature]*

Official Court Interpreter and Translator
United States District Court
for the District of Puerto Rico

APPENDIX II

## BEFORE THE COMPLAINT COMMITTEE
## OF THE ACUEDUCTS AND SEWERS AUTHORITY

IN THE CASE OF
IGNACIO GUAL MORALES

Vs.

ACUEDUCTS AND SEWERS
AUTHORITY

COMPLAINT NO. 74-3 CH

Re: DISMISSAL

The hearing of this Complaint was held on the following days: October 22, 1974, March 1, 1975 and March 24, 1975. As a result of the evidence presented and in conformity with the dispositions of Article VI of the Collective Agreement suitable to the case, we consider that the following facts have been established:

### FINDINGS OF FACT

1. Engineer Ignacio Gual Morales occupied the position of Engineer III in the Section of Urban Projects of the Acueducts and Sewers Authority. He was dismissed on June 14, 1974.

2. On May 17, 1971, Mr. Gual requested and obtained authorization to use his personal vehicle for official business (Exh. 9). To that effect Mr. Gual used his vehicle for official business on different occasions since May 17, 1971 till the year 1974.

3. Toward the middle of 1974, a controversy between the Union and the Authority arose related to the mileage payment when the employee uses his personal vehicle for official purposes. To those effects, the Union approved a Resolution (Exh. 6) requesting that the payment of mileage be revised based on the increase in the cost of gasoline, to which the Authority refused. (Exhs. 7 and 8). At a meeting held on June 13, 1974, the Union's Board of Directors agreed to withdraw said Resolution. (Exh. 10) Mr. Gual voted against this last agreement.

4. On the same day, June 13, 1974, Mr. Gual was ordered to make a field test in Guaynabo starting that same day. It was arranged that "the trips to the project site would be done in the automobile property of Ignacio Gual, accompanied by Jorge Castelblanco." (Exh. 12)

5. To that order Mr. Gual replied in the following manner: "By the present I notify that trip authorization no. 966 for the use of my vehicle in official matters, be left without effect." (Exh. 14) The result of this action was that Mr. Gual did not fulfill the field study he was ordered to do.

6. On June 14, 1974, the Authority's Acting Executive Director summarily dismissed Mr. Gual. (Exh. 3)

7. In his request to use his own vehicle on official matters (Exh. 9) Mr. Gual himself expressed: "*It is necessary* to use my vehicle for the studies I realize for the design of the different projects assigned to me." (Underlining Supplied) Likewise, upon answering a questionnaire about classification and evaluation of positions (Exh. 11) he answered in the affirmative the question "Does your work require you to drive motor vehicles?"

8. There can be no doubt that the disposition of Article 931.4 of the Administrative

Proceedings Manual (Exh. 2) as well as the dispositions of Article XVI of the Collective Agreement (Exh. 1) examine the necessity of the employee to use his personal vehicle for official purposes.

9. When Mr. Gual made the request to use his vehicle in official trips (Exh. 9) he recognized that necessity. When said request was approved, mutual obligations were created between the parties which were not susceptible to be left without effect unilaterally, unless one of the parties did not fulfill his obligations. Article 1077 of the Civil Code, 31 L.P.R.A. 3052.

10. Mr. Gual's attitude constituted a negative to obey a valid order. His negative to carry out said order constitutes a clear case of insubordination since he did not prove that his vehicle was not in working condition nor that he could not drive nor use it. This is a case of defiance against the Authority and even against the Union itself since they, the Union, accepted that the request for an increase in the mileage did not proceed while the collective agreement is in effect. Mr. Gual's conduct falls, in full, inside the conduct forbidden by Article 16 of Law no. 142 of June 30, 1961, 29 L.P.R.A. 496.

## CONCLUSIONS OF LAW

1. It has been said repeatedly that an employee's disobedience of the rules and orders of his employer constitute a just cause for his dismissal. *Wolf v. Neckwear Corp.* 80 D.P.R. 537 and cases quoted there. It has also been sustained that in all employment contracts there exists the condition, expressed or implicit, that the employee has to fulfill the duties of his work. *Blanes v. District Court* 69 D.P.R. 113.

2. Article XVI, Section 1, of the Collective Agreement states that "when an em-ployee covered by this agreement is required to work outside the limits of his official work station the Authority will provide him with transportation or it will reimburse him the cost for this concept . ." (Underlining Supplied). As it can be seen, the option belongs to the Authority, not to the employee, and once the Authority exercises the option, the employee cannot capriciously refuse to verify the required work. Specially when, as in this case, the employee himself has recognized the need to use his vehicle for official purposes. As we have already pointed out, Mr. Gual did not offer any reason that could at least explain his negative to use his motor vehicle to go to the place where the field work was to be verified.

3. If as of the facts of this case the summary dismissal proceeded or not is independent, the true fact is that the Union did not request the preliminary hearing before the Industrial Relations Director as is stated in Section 3 of Article VI, of the Collective Agreement; for which reason the statement made by the Union's lawyer in his Memorandum of April 25, 1975, is academic.

## FINDING

We conclude that Mr. Gual's conduct had the effect of "interrupting or diminishing or intending to interrupt or diminish the services" which the Authority renders the public, and moreover, that such conduct constitutes an unjustified neglect of the service within the concept of Article VI Section 3(B) of the Collective Agreement. For which reason it proceeds to confirm, as is confirmed by the present document the dismissal of Engineer Ignacio Gual Morales.

At San Juan, Puerto Rico, on July 8, 1975.

(signed) ELI B. ARROYO
President

(wet stamp from the ASA Complaint Committee)

IN AGREEMENT:
 (illegible)
 (illegible)

NOT IN AGREEMENT:
 Pedro Luis Pacheco (signed)
 Cayetano Rivera Caraballo (signed)

*Certification:*

I certify that the preceding is a true and exact copy of the Findings of Fact, Conclusions of Law and Finding emitted by the Complaint Committee established in agreement with the collective agreement subscribed on September 29, 1972 by the Acueducts and Sewers Authority of Puerto Rico and the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, AFL–CIO in the case of Ignacio Gual Morales, complaint no. 74–3 (H), re: dismissal.

I issue the present certification by request of Mr. Ramón A. Cancio, Esq. for the official use of the Acueducts and Sewers Authority of Puerto Rico, in agreement with Resolution no. 805 approved by the Governing Board of the Acueducts and Sewers Authority of Puerto Rico on February 17, 1976.

On February 25, 1976.

 (signed) Elma Rosa
Secretary of the Complaint Committee

(wet stamp of the Acueducts and Sewers Authority, Complaint Committee)