**Daniel A. KOROMA, et al., Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

Civ. A. No. 84–3556.

United States District Court,
District of Columbia.

Feb. 25, 1986.

Barry D. Bardack, Washington, D.C., for plaintiffs.

Michael L. Martinez, Asst. U.S. Atty., Washington, D.C., for defendant.

### OPINION

JUNE L. GREEN, Senior District Judge.

This is an action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b),

2671 *et seq.* Plaintiffs seek damages for false arrest and false imprisonment, arising out of their arrest by agents of the Federal Bureau of Investigation ("FBI") on September 9, 1981. A trial to the Court was held on February 3 and 4, 1986. The Court heard testimony from plaintiffs David Conteh, Daniel Koroma, Ahmadu Conteh, Thomas Bangura, Mohammed S. Mansaray, Mohammed Koroma, Theophilus Kessebeth; FBI Special Agents Thomas Nicoletti and James Werth; former Sergeant Joseph Tutka of the Uniformed Division of the United States Secret Service ("Secret Service"); and Officers David Kielbasa and George Lee, also of the Secret Service. For the reasons stated below, the Court finds that the plaintiffs were arrested and imprisoned falsely, and awards each plaintiff $1,500 in damages.

## FINDINGS OF FACT

The seven plaintiffs are citizens of the country of Sierra Leone and were such on September 9, 1981. On the evening of September 8, 1981, the plaintiffs, along with several others, met and agreed to go the next day to the Chancery of Sierra Leone. They were concerned about reports of rioting and other disturbances in Sierra Leone and planned a visit to the Chancery for the next morning in order to obtain more information about these events.

On the morning of September 9, 1981, plaintiffs and several others went to the Chancery, which is located at 1701 19th Street, N.W., Washington, D.C. Plaintiffs Thomas Bangura, Mohammed Mansaray and another individual not a party to this action proceeded upstairs to the office of the Charge d'Affaires, Mr. Ahmed A. Seray-Wurie after the receptionist announced their arrival. Plaintiffs David Conteh, Daniel Koroma, and Ahmadu Conteh waited in the first floor lobby of the Chancery. Plaintiffs Mohammed Koroma and Theophilus Kessebeth arrived at the Chancery grounds but did not enter the Chancery.

Several of the plaintiffs testified that they were well acquainted with the Chancery personnel, including the Charge d'Affaires. For instance, Daniel Koroma testified that the receptionist, Isatuh Fullah, is his sister-in-law; Ahmed Conteh declared that he is a close friend of the Charge d'Affaires; and Mohammed Mansaray testified that he is a maternal relation of Charge d'Affaires Seray-Wurie.

Secret Service Officers Kielbasa and Lee, responding to a radio dispatch reporting that the Chancery was in "distress," arrived on the scene approximately five minutes after the group including the plaintiffs entered the Chancery. Officers Kielbasa and Lee reported that they found people milling about on the first floor. The officers testified that the receptionist appeared to be upset or confused and that they had difficulty communicating with her due to her broken English. Officers Kielbasa and Lee then proceeded upstairs to investigate the noise coming from there.

Shortly after Officers Kielbasa and Lee entered the Chancery, Sergeant Tutka arrived. He found the receptionist seated and remarked that the receptionist's cubicle was in order. Sergeant Tutka also testified that he had difficulty understanding the receptionist. Sergeant Tutka proceeded directly to the second floor to join Officers Kielbasa and Lee.

The three Secret Service officers reported some confusion on the second floor with people running around and doors closing. Officers Kielbasa, Lee, and Tutka entered Charge d'Affaires Seray-Wurie's office and found him there with four or five other gentlemen. The Secret Service officers stated that Mr. Seray-Wurie was confused and upset and wanted the other people in his office, including plaintiffs Bangura and Mansaray, to leave, but Mr. Seray-Wurie told Sergeant Tutka that he did not want them arrested. Officers Kielbasa, Lee, and Tutka found Mr. Seray-Wurie's office to be in order, citing no evidence of a disturbance. At no time did the three Secret Service officers witness any threat or act of violence. The Secret Service officers were never able to ascertain who called the police.

Pursuant to Mr. Seray-Wurie's request, the Secret Service officers escorted the men out of Mr. Seray-Wurie's office, and cleared the building of all non-Chancery personnel. Sergeant Tutka told them that they would not be arrested if they left the Chancery quietly, in accordance with Mr. Seray-Wurie's wish. The group, including plaintiffs, left peacefully and they assembled on the sidewalk across the street from the Chancery.

Shortly after the unauthorized people in the Chancery had exited, Special Agents Nicoletti and Werth of the FBI arrived. They conferred briefly with Sergeant Tutka, then Agent Nicoletti interviewed Mr. Seray-Wurie while Agent Werth spoke with Ms. Fullah, the receptionist. Both FBI Agents testified, contrary to all the other witnesses, that Mr. Seray-Wurie appeared disheveled and that his office and the receptionist's cubicle were in a state of great disorder. Agent Nicoletti testified that Mr. Seray-Wurie told him that he had been physically assaulted. Agent Werth testified that Ms. Fullah also reported being assaulted, her broken English aside. None of the supposed victims of this assault testified at trial or provided any verification of these events.

While being interviewed by Agent Nicoletti, Mr. Seray-Wurie pointed from his second-story window to a group of ten to fifteen men who were standing on the sidewalk and said that they were the ones who had entered his office. Not long thereafter, this group left to get their automobiles and then proceeded to drive to a parking lot on 21st and M Streets, N.W., in Washington, D.C. Sergeant Tutka followed them in his cruiser as the FBI Agents had asked him to do.

Agent Nicoletti, meanwhile, telephoned his supervisor and Assistant United States Attorney Herbert DiFonzo to advise them of the situation and that there had apparently been an assault on Charge d'Affaires Seray-Wurie in violation of 18 U.S.C.

§ 112(a). Both persons authorized Nicoletti to arrest the persons involved in the assault.

Agent Nicoletti radioed the Secret Service officers to detain the suspects at their present location, the 21st and M Street parking lot. Sergeant Tutka testified that he informed the suspects that they were no longer free to go. Agent Nicoletti proceeded to the parking lot in order to question the suspects. Upon his arrival, Sergeant Tutka explained that there were eleven suspects and that the whole group had left the Chancery together.

Agent Nicoletti asked each of the men if they understood English, and all replied affirmatively. Agent Nicoletti informed them of their rights and then asked each suspect, "Did you make unauthorized entrance to the Embassy [sic] of Sierra Leone?".[1] Ten of the eleven suspects replied affirmatively; one asked to speak with an attorney, instead. Agent Nicoletti then placed the eleven suspects under arrest and charged them with violating 18 U.S.C. § 112(a). Among those arrested were the seven plaintiffs in this civil action.

This group, including the seven plaintiffs, were transported in a District of Columbia police wagon to the FBI substation in Washington, D.C. They were processed and interrogated for approximately two hours. They were then transported to the District of Columbia Central Cellblock at police headquarters where they were processed for a second time. The plaintiffs were kept overnight in jail.

The next afternoon, September 10th, the plaintiffs were transported to the holding cell of the United States Courthouse. After they appeared before a United States Magistrate, six of the seven plaintiffs were released on bond. Plaintiff David Conteh was held in custody for another night at the request of the Immigration and Naturalization Service. He was released on bond on September 11, 1981. While on bond, the plaintiffs were required to report

---

1. Each of the plaintiffs testified that Agent Nicoletti only asked whether they had been at the Chancery.

to the District of Columbia Pretrial Services Agency, and were forbidden from going to or near the Chancery of Sierra Leone.

On September 16th, the plaintiffs were directed to appear at police headquarters for a line-up. Each of the seven plaintiffs were identified by Chancery personnel as among those that had been in the Chancery the morning of September 9, 1981. On March 12, 1982, the United States Attorney's Office declined prosecution of the seven plaintiffs and their cases were dismissed. The plaintiffs presented their administrative claims pursuant to the FTCA, 28 U.S.C. §§ 2401(b), 2675(a), and 2680(h) in a timely fashion on September 6, 1983.

### Conclusions of Law

The United States is liable under the FTCA for tort claims "in the same manner and to the same extent as a private individual under like circumstances" would be. 28 U.S.C. § 2674. The FTCA explicitly provides that the Government's liability shall be determined "in accordance with the law of the place where the [wrongful] act or omission occurred." 28 U.S.C. §§ 1346(b), 2672.

Under the tort law of the District of Columbia, the elements of the torts of false arrest and false imprisonment are (1) the detention or restraint of one against his will within boundaries fixed by the defendant, and (2) the unlawfulness of the restraint. *Faniel v. C & P Telephone Co.,* 404 A.2d 147, 150 (D.C.App.1979). The torts of false arrest and false imprisonment are indistinguishable. *Shaw v. May Department Stores, Inc.,* 268 A.2d 607, 609 n. 2 (D.C.App.1970).

The "focal point" in this type of action "is the question whether the arresting officer was justified in ordering the arrest of the plaintiff[s]; if so the conduct of the arresting officer is privileged and the action fails." *Dellums v. Powell,* 566 F.2d 167, 175 (D.C.Cir.1977). Under District of Columbia law, the detention is presumed to be unlawful once "an allegation [is made] that a plaintiff was arrested and imprisoned without process." *Clarke v. District of Columbia,* 311 A.2d 508, 511 (D.C.App. 1973). The burden then shifts to the defendant to justify the arrest. *Id., accord Pierson v. Ray,* 386 U.S. 547, 556–57, 87 S.Ct. 1213, 1218–19, 18 L.Ed.2d 288 (1967). Justification can be established by showing that the arresting officer had probable cause for arrest of the plaintiff on the grounds charged or that he had a reasonable basis to believe that a crime had been committed and the officer acted in good faith in making the arrest. *Dellums v. Powell,* 566 F.2d at 175.

Thus, the only issue is whether Agent Nicoletti, the arresting officer, "acted in good faith in arresting plaintiffs and whether his actions were reasonable in light of all the circumstances." *Id.,* at 176; *accord Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974). The facts of this case, while they may indicate good faith on Agent Nicoletti's part, certainly do not demonstrate that his actions were reasonable. Agents Nicoletti and Werth never saw any of the plaintiffs on Chancery property, let alone witness any act of violence threatened or committed by plaintiffs. Sergeant Tutka and Officers Kielbasa and Lee, the first law enforcement officials on the scene, testified that they saw no evidence of any illegal or threatening activity and that Charge d'Affaires Seray-Wurie wanted only that the plaintiffs and others depart the Chancery, not that they be arrested. No victims of the alleged violence committed by plaintiffs offered any testimony at trial.

Further, the Court is confronted with the fact that the plaintiffs were identified to Agent Nicoletti by Mr. Seray-Wurie as he spied them on the opposite sidewalk from his second-story window. While Agent Nicoletti is to be commended for consulting with his superiors before taking action, the fact that the group which included the plaintiffs was allowed to leave the scene only to be detained and arrested many blocks away does nothing to support the reasonableness of Agent Nicoletti's actions.

Thus, while Agent Nicoletti may have had an honest belief that plaintiffs had violated 18 U.S.C. § 112(a), the Court concludes that this belief was not a reasonable one in light of the facts available to him at the scene. While the Court does not favor second-guessing trained law enforcement officials, neither can it sit idle when the weight of the evidence indicates that the arrest in issue amounted to an unwarranted interference with plaintiffs' personal liberties.

Despite the intangible nature of the injury suffered and the lack of substantial evidence regarding any real losses sustained, the Court must, nevertheless, weigh the significance of the defendant's transgression. The concept of personal freedom is at the core of our democratic beliefs. When such a principal element of our democratic system is violated, retribution (imprecise though it may be) must be made as testimony to the freedoms we value so highly. *See Dellums v. Powell,* 566 F.2d at 194–96. Accordingly, the Court awards each plaintiff $1,500 in damages.