Rebecca M. KAISER and Paul A. Kaiser, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 89–1870 SSH.

United States District Court, District of Columbia.

March 27, 1991.

John R. Dugan, Rockville, Md., for plaintiffs.

Mark E. Nagle, Asst. U.S. Atty., Washington, D.C., for defendant.

## OPINION

STANLEY S. HARRIS, District Judge.

This is an action brought by plaintiffs for damages against the United States of America, pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C.A. §§ 1346(b),

2671–2680. A bench trial was held on July 5 and 6, 1990. After careful consideration of the evidence presented at trial and the parties' proposed findings of fact and conclusions of law, the Court makes the following findings.

### Findings of Fact

On November 13, 1985, plaintiffs walked their dogs eight blocks from their home on Maryland Avenue, N.E., to the Upper Senate Park near Delaware Avenue, N.E., in Washington, D.C. Plaintiff Rebecca McClellan Kaiser's dog, Kalamazoo (Kal), was a mixed breed Great Dane and Labrador Retriever, weighing approximately 80 pounds.[1] Plaintiff Paul Kaiser had a Doberman Pinscher named Huckleberry Finn. When they reached the Park at approximately 9:10 p.m., plaintiffs took off the dogs' leashes, as they normally did, and encouraged them to run around a grassy area that is bounded by shrubbery on three sides and a sidewalk on the fourth (hereinafter "grassy patch"). As indicated in plaintiff's exhibit 2, there are streetlights positioned along the sidewalk and at the end of the shrubbery-bordered area that is nearest to a large fountain.

On the same evening, Officer David Miller, United States Capitol Police, K–9 Division, was patrolling the grounds with his K–9 dog Vulcan, on a 2:00 to 10:00 p.m. shift.[2] Miller had had Vulcan, a German Shepard, since he was a puppy, and had donated him to the Capitol Police. Miller was a patrolman in the K–9 Division from the Fall of 1979 through March 1987, when he became a supervisor. Prior to his employment with the Capitol Police, Miller had had five years of experience with K–9 dogs. In addition, he had had training in the handling of firearms both before and after joining the Capitol Police and was tested yearly in the use of firearms. He and Vulcan, competing as a team, had received certificates of excellence for their performance as a team.

The primary duty of Capitol Police K–9's is detecting explosives at the Capitol. However, they also are responsible for patrolling the entire Capitol grounds. On November 13, 1985, Miller and Vulcan were on patrol duty on the Senate side of the Capitol. Shortly after 9:00 p.m., they were approaching the Upper Senate Park when they heard a dog bark. Miller looked toward the grassy patch and saw two dogs running loose. He did not see the plaintiffs or any other persons in the vicinity. In order to avoid a confrontation with the dogs, he changed direction and walked through a dark area, past a line of trees, and into the open area beyond the trees.[3]

Miller's efforts to avoid a confrontation were to no avail, as Vulcan began to bark and strain on his leash. When Miller turned, he saw Kal rushing toward him. At the same time, McClellan began calling out to Kal who then stopped, reversed direction, and proceeded again to rush toward Miller and Vulcan. McClellan could not see Miller and Vulcan at that time. Likewise, Miller still did not see McClellan or Kaiser. He also did not hear McClellan call out to Kal, although he did hear some shouts that he was unable to distinguish. In an attempt to control Vulcan, who was throwing Miller off balance, Miller pulled the dog's front legs off the ground by drawing back on the leash. Because Capitol Police K–9's are worth between $5,000.00 and $10,000.00 and are used for the purpose of detecting explosives rather than for protecting officers, Miller was attempting to avoid a physical confrontation between the two dogs. He did not yell at Kal or kick at him. He was not carrying a blackjack or a nightstick and did not throw anything at the dog.[4] Fearing imminent danger to his own safety, Miller reached

---

1. Since the lawsuit was filed, plaintiffs have divorced and Rebecca Kaiser has resumed use of her maiden name, McClellan. The Court will hereinafter refer to her as McClellan for ease of identification of the plaintiffs.

2. While an officer at the time of the incident leading to this lawsuit, Miller is now a Sergeant.

3. This area is across the sidewalk from the grassy patch.

4. The blackjack had been recalled, and Miller had been trained that a nightstick would distract a K–9.

for his revolver and, with his outstretched arm at a 45–degree angle from the horizontal, fired one round, striking Kal in the back.[5] He had not been bitten by Kal.[6]

McClellan then approached Miller and asked him if he had shot her dog, and he responded that he had. McClellan went to her dog, and Miller called for assistance, keeping Kal within view. Within moments, several other Capitol Police officers arrived at the scene. Kal was bleeding profusely from the mouth, and one officer showed McClellan where the bullet had entered his body. Another officer approached McClellan and told her to move away from the dog. Highly agitated, she asked why, and was told to "shut up." When she resisted and went back to Kal, she was told that she would be locked up if she did not stand back away from the dog and shut up. Sergeant James Proctor swore at McClellan several times.[7]

. The situation became quite confused. In total, some 20–30 officers arrived and began trying to determine what had happened.[8] McClellan became nearly hysterical as she went from one officer to the next demanding that they do something to help her dog. At one point, she even knelt down and begged a senior officer for assistance for her dog. The officers attempted to contact the Humane Society, plaintiff's veterinarian, and a friend of plaintiffs in an effort to obtain transportation for the dog. Capitol Police regulations prohibit transporting an animal in an official vehicle, including the K–9 vehicle, to protect against possible infection to the K–9 dogs or the officers themselves. As the officers were discussing the possibility of using a paddy wagon to transport the dog, McClellan ran out into the street and flagged down a passing motorist, Richard Pasco, who, with his companion, Laura Dowling, agreed to assist in transporting Kal to a veterinarian. Pasco drove the car to where Kal was lying, and put him into the back of the car. As McClellan prepared to leave with the dog, Sergeant Proctor told her that she could not leave until she provided information about the dog's ownership, her address, and other similar information. She objected, and the situation became quite tense until Kaiser stepped in and offered to stay at the scene and provide all

**5.** At that time, Kal was across the sidewalk from the grassy patch, in the tree area. McClellan, too, had crossed the sidewalk by that time, and was approximately 30 feet from Miller. Kaiser remained in the grassy patch with his dog at his side, six yards behind McClellan.

**6.** It is the policy of the United States Capitol Police that an officer should use the minimum amount of force necessary to accomplish a mission, and that all other means of accomplishing that mission should be exhausted before resorting to the use of a weapon. In other words, use of a firearm should be an officer's last resort. In this light, it is permissible to use a firearm in performing one's duties if the officer has a reasonable belief that he is in danger of death or serious bodily injury. It also is permissible to use a firearm to kill a dangerous animal. A Capitol Police officer is not permitted to use his weapon as a warning. In addition, it is the policy of the Capitol Police that an officer must consider the safety of innocent bystanders in deciding whether to discharge a weapon.

Dr. Michael Fox, an employee of the Humane Society of the United States, testified as plaintiffs' expert in animal behavior. Based on a hypothetical situation presented by plaintiffs (and thus favorable to plaintiffs), and on the premise that virtually all dogs behave in predictable ways, Fox concluded that Kal's motivational state as he ran toward Miller was play, and that his behavior could not have been interpreted as aggressive until physical contact was made. He also opined that if a person is unsure of a dog's intentions, he should try talking to the dog, calling out to the owner, kicking the dog, using his own dog to attack it, reaching for a stick, or firing a warning shot.

The Court notes that Fox has done extensive research on canine behavior and has written books on raising and understanding dogs. In addition, he has written animal rights' pamphlets. However, he has not written on the use of dogs in law enforcement and acknowledged having no knowledge of Capitol Police procedures.

**7.** Under Capitol Police policy, officers are required to conduct themselves in a courteous fashion and to refrain from using profane language. Sergeant Proctor ultimately was reprimanded by the Capitol Police for his treatment of McClellan.

**8.** When a member of the Capitol Police force uses a weapon, that officer must make a report to his commanding officer. In addition, members of the force are required to make full reports of any injuries or property damage on the Capitol grounds, with any necessary notes to be made at the scene of the incident.

necessary information. Before McClellan left, Detective Joseph DePalma issued to plaintiffs a citation for an unleashed dog.

Pasco drove McClellan and Kal to the Friendship Animal Hospital in Northwest Washington. They were followed by an officer in a police car with its headlights turned off. When they arrived at the hospital at approximately 10:15 p.m., the veterinarian was waiting for them, leading McClellan to believe that the officers had called to alert the hospital. Kal was admitted to the hospital, and surgery was performed the following day. He died five days later. Plaintiffs incurred a veterinarian bill in the amount of $1,786.50.

William David Brooks witnessed the shooting. He was standing near the fountain with his four-year-old son, waiting for his wife, who worked in the Senate cafeteria. From the time he first saw Miller and Vulcan, he kept his eye on them, because his son was afraid of dogs. After the incident, he stayed on the scene to offer his statement of what had happened.[9] He offered a statement which the officers wrote down, but he has not seen the statement since that time, despite having requested it.

After the incident, plaintiffs cooperated with the Capitol Police in the investigation of the incident. Their main concern was to ensure that Miller not be permitted to carry a gun again. Plaintiffs filed an administrative complaint with the Capitol Police, but were not satisfied with the way in which it was handled. In McClellan's own words, the incident "haunted" her. She lost her energy and her self-esteem. She was so distraught that she could no longer work effectively. Moreover, she had been in the process of interviewing for a new job, but she found she no longer could focus on the interviews and would always talk about the incident. She was not offered employment as a result of any of those interviews.[10]

In January 1986, McClellan awoke in the night and imagined that a person with a gun was in the house who would kill her and Kaiser. She awakened Kaiser and told him that they must leave the house immediately, which they did. However, police found no signs of a break-in or of an intruder. After that incident, McClellan sought professional help from Susan Drobis, a clinical social worker. She saw Drobis once a week from February 1986 through January 1987. After about eight months of counseling, McClellan was able to get back to normal functioning. She resumed exercising and found a new job.

Drobis diagnosed McClellan as suffering from post-traumatic stress disorder.[11] She based her diagnosis on the fact that McClellan had been through a traumatic, unexpected event, and subsequently exhibited the following symptoms: recurrent distressing dreams, recurrent recollections of the incident, diminished interest in her activities, feelings of estrangement, hyperalertness, sleep disorders, guilt, difficulty concentrating, and intensification of symptoms by exposure to events that symbolize or resemble the traumatic event.[12] When

---

9. At the trial, Brooks testified that initially he was hesitant to stay on the scene to explain what he had seen because he knew one of the officers. However, according to his testimony, he gave a statement because of the way in which the officers had intimidated McClellan. He also testified that the shooting was not justified. However, in a previous statement, he claimed that he thought the officer was justified in shooting and that he stayed on the scene because he was afraid the officer would get into trouble. Accordingly, his testimony must be viewed with caution.

10. McClellan's federal income tax returns for 1985 and 1986 reveal that she made $10,000.00 less in 1986 than in 1985.

11. On the strength of her credentials, the Court certified her as an expert in clinical social work.

The Court noted, however, that Drobis had never before diagnosed post-traumatic stress disorder, and has done so only once since treating McClellan.

12. In addition, plaintiffs began to experience problems in their marriage. For one, plaintiffs' disagreement over how best to deal with their administrative grievance with the Capitol Police caused them a great deal of stress. They had some joint visits with Drobis during 1986 in an effort to work out their differences. In June 1987, McClellan resumed counseling sessions with Drobis, because she was again experiencing marital problems. Ultimately, as noted, plaintiffs' marriage ended in divorce.

the counseling ended in January 1987, Drobis considered it to have been successful. The bills for the counseling totalled $1,305.00.

### Conclusions of Law

#### 1. Assault and Battery

■ In Count I of their complaint, plaintiffs allege that the actions of Officer Miller in drawing his weapon and discharging it in their direction constituted an assault and battery. "An assault results from apprehension of an imminent harmful or offensive contact, in contrast with the contact itself." *Person v. Children's Hospital Nat'l Medical Center*, 562 A.2d 648, 650 (D.C.1989) (citing Keeton, Dobbs, Keeton & Owen, Prosser and Keeton on Torts § 9 (1984)). To find defendant liable for assault, the Court must find that Miller intentionally placed plaintiffs in apprehension of immediate harmful conduct. *Madden v. D.C. Transit System, Inc.*, 307 A.2d 756, 757 (D.C.1973).

Miller did not intend to cause plaintiffs any apprehension of harmful contact. Indeed, he did not even see plaintiffs at the time he aimed and fired his weapon. Furthermore, plaintiffs did not experience the requisite apprehension. Kaiser never saw Miller pointing his gun, and McClellan saw his outstretched arm only at the instant the gun was fired. The Court concludes that she had little or no time to experience apprehension and that, even if she did, she experienced apprehension of harm to her dog, not to herself. Plaintiffs' after-the-fact realization that they could have been in the line of fire is not enough to constitute assault.

"A battery is 'harmful or offensive contact with a person, resulting from an act intended to cause [that person] ... to suffer such contact....'" *Person*, 562 A.2d at 650 (quoting Prosser and Keeton § 9). Miller did not intend to make contact with the plaintiffs, nor did he actually do so. Thus, the Court concludes that Miller's actions constituted neither assault nor battery.

#### 2. False Arrest and Imprisonment

■ In Count II, plaintiffs claim that Capitol Police officers, including but not limited to Proctor, unreasonably and without just cause detained and arrested plaintiffs, causing them to be embarrassed, humiliated, and emotionally distressed. "The torts of false arrest and false imprisonment are indistinguishable." *Koroma v. United States*, 628 F.Supp. 949, 952 (D.D.C.1986) (citing *Shaw v. May Department Stores Co.*, 268 A.2d 607, 609 n. 2 (D.C.1970)). "False imprisonment is defined, in this jurisdiction, as the restraint by one person of the physical liberty of another without consent or legal justification. The essential elements of the tort are (1) the detention or restraint of one against his will, within boundaries fixed by the defendant, and (2) the unlawfulness of the restraint." *Faniel v. Chesapeake & Potomac Telephone Co.*, 404 A.2d 147, 150 (D.C.1979) (citations omitted).

Plaintiffs were not formally arrested. However, they were surrounded by 20 to 30 officers and, as they prepared to leave to take Kal to the veterinary hospital, they were informed that they could not leave until they answered the officers' questions. After an argument ensued, McClellan was permitted to leave, while Kaiser remained behind to answer the officers' questions.

The confusion at the scene of the shooting caused by McClellan's state of near hysteria, the officers' lack of organization, and uncertainty as to how to transport Kal, resulted in the elapse of a greater period of time than probably was necessary before Kal could be transported to a veterinary hospital. However, the fact remains that a shooting had occurred, and the officers were required to gather as much information at the scene as was necessary to conduct their investigation, for plaintiffs' benefit as much as for anyone else's. Obviously, the officers needed to gather information from plaintiffs. However, plaintiffs' first concern was transporting the dog to a veterinarian and, until they had solved the transportation problem, they were not interested in cooperating with the officers in their investigation.

The Court finds that the detention of plaintiffs at the scene of the shooting was not unlawful, but rather was legally justified. Therefore, the plaintiffs were not falsely arrested or imprisoned.

### 3. *Property Loss*

■ In Count III, plaintiffs allege that they suffered a loss of property in the amount of the veterinarian bill, $1,786.50. It is not clear from the complaint under what theory of liability plaintiffs seek this recovery. However, in their proposed conclusions of law, plaintiffs allege that "the United States is liable for loss of property due to negligence or wrongful acts or omissions of an employee of the government."

The Court finds that Miller was negligent in shooting Kal as quickly as he did. It is apparent that the policy of the Capitol Police is to use a weapon only as a last resort. Although the use of the weapon may have become necessary as the confrontation escalated, there were alternative measures that a reasonable officer concerned about his own safety and the safety of his K–9 would have taken to avoid being attacked by Kal. The Court finds that, as a result of Miller's negligence, plaintiffs suffered a loss of property in the amount of $1,786.50. The defendant, therefore, is liable for that amount.

### 4. *Intentional Infliction of Emotional Distress*

■ In Count IV, plaintiffs allege that Miller shot Kal with reckless disregard for the safety of McClellan, who, they allege, was in the direct line of fire, thus causing her to suffer extreme emotional distress requiring medical care. To recover for the tort of intentional infliction of emotional distress in the absence of a physical injury, McClellan must demonstrate " '(1) "extreme and outrageous" conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff "severe emotional distress." ' " *Abourezk v. New York Airlines, Inc.*, 895 F.2d 1456, 1458 (D.C.Cir.1990) (citing *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C.), *cert. denied*, 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982)). The defendant is only liable if Miller's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46, Comment d at 73.

There is no question but that McClellan suffered emotional distress arising out of the incident. However, the Court finds that it resulted from what she perceived to be the senseless shooting of her pet, not from any disregard for her own safety. Moreover, in no way did Miller's conduct rise to the requisite level of outrageousness and atrocity to warrant recovery under this theory.

### 5. *Negligent Infliction of Emotional Distress*

■ Finally, in Count V, plaintiffs allege that Miller caused McClellan to suffer emotional distress by shooting Kal in the direct line of McClellan, negligently and with careless disregard for her safety. To recover for negligent infliction of emotional distress in the absence of a direct physical injury, plaintiffs must show that McClellan "was in the zone of physical danger and was caused by [Miller's] negligence to fear for ... her own safety...." *Williams v. Baker*, 572 A.2d 1062, 1067 (D.C.1990) (*en banc*). As stated above, plaintiff did not have time to fear for her own safety. To the extent that she may have experienced fear, it was fear for the safety of her dog. Moreover, it can hardly be said that she was in the zone of danger, because Miller aimed his gun downward toward the dog, who was considerably closer to Miller than McClellan was. And, again, her emotional distress did not arise out of fear for her own safety, but rather arose out of grief over the shooting and eventual death of her pet.

An appropriate Order accompanies this Opinion.

### ORDER

Upon consideration of all of the evidence presented at the July 5 and 6, 1989, bench

trial and the parties' proposed findings of fact and conclusions of law, for the reasons set forth in the accompanying Opinion, it hereby is

ORDERED, that judgment is entered in favor of the plaintiffs in the amount of $1,786.50 as to Count III. It hereby further is

ORDERED, that judgment is entered in favor of the defendant as to Counts I, II, IV, and V.

SO ORDERED.